FOLEY BROS., INC. ET AL. *v.* FILARDO.

No. 91. Argued December 15, 1948.—Decided March 7, 1949.

*Robert L. Stern* argued the cause for petitioners, who had a wartime "cost-plus" contract with the Government. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison* and *Samuel D. Slade.*

*Chester A. Lessler* argued the cause for respondent. With him on the brief was *Howard Henig.*

MR. JUSTICE REED delivered the opinion of the Court.

This case presents the question whether the Eight Hour Law [1] applies to a contract between the United States and a private contractor for construction work in a foreign country.

This Act provides that

> "Every contract made to which the United States . . . is a party . . . shall contain a provision that no laborer or mechanic doing any part of the work contemplated by the contract, in the employ of the contractor or any subcontractor . . . shall be required or permitted to work more than eight hours in any one calendar day upon such work; . . ." 37 Stat. 137, 40 U. S. C. § 324.

Penalties are specified for violations. In 1940 the prohibition against workdays of longer than eight hours was modified as follows:

> "Notwithstanding any other provision of law, the wages of every laborer and mechanic employed by

---

[1] 27 Stat. 340, as amended, 40 U. S. C. §§ 321–326.

any contractor or subcontractor engaged in the performance of any contract of the character specified in sections 324 and 325 of this title, shall be computed on a basic day rate of eight hours per day and work in excess of eight hours per day shall be permitted upon compensation for all hours worked in excess of eight hours per day at not less than one and one-half times the basic rate of pay." 54 Stat. 884, 40 U. S. C. § 325a.

In 1941 petitioners contracted on a cost-plus basis to build certain public works on behalf of the United States in the East and Near East, particularly in Iraq and Iran. Petitioners agreed in the contract to "obey and abide by all applicable laws, regulations, ordinances, and other rules of the United States of America." The provisions of the Eight Hour Law were not specifically included in the contract. In 1942 petitioners hired respondent, an American citizen, to work on the construction projects as a cook at sixty dollars a week. This contract of employment contained no provision concerning hours of work or overtime. Pursuant to the contract, respondent went to Iraq and Iran where he frequently worked more than eight hours a day during the years 1942 and 1943.

Upon the refusal of his request for overtime pay for work in excess of eight hours per day, he brought suit against petitioners in the Supreme Court of New York, claiming that the Act entitled him to one and one-half times the basic rate of pay for such work. The court denied petitioners' motions to dismiss the case and for a directed verdict, thereby overruling the contention that the Act did not apply to contracts which were to be performed in foreign countries. Judgment was entered on a jury verdict for respondent. The Appellate Division reversed on the ground that the Eight Hour Law as amended did not confer a right of action on an employee for overtime pay. 272 App. Div. 446, 71 N. Y. S. 2d 592.

Consequently it did not consider the question now before us. The New York Court of Appeals reversed, holding that the Act applied to this contract. 297 N. Y. 217, 78 N. E. 2d 480. Referring to the language of the statute quoted above, it concluded, "Words of such inclusive reach cannot properly be read to exclude contracts for government jobs abroad." We granted certiorari to settle this important question concerning the scope of the Eight Hour Law. 335 U. S. 808.

Since the question is one of statutory interpretation, the Act as it now exists, 40 U. S. C. §§ 321–326, is our starting point. In pertinent part it provides for the limitation to eight hours per day of the working time of laborers and mechanics employed by the government or any contractor thereof on a public work of the United States. § 321. The same section makes it unlawful to require or permit work in excess of eight hours per day except in extraordinary emergencies. An intentional violation of this mandate is made a misdemeanor punishable by fine or imprisonment or both. § 322. The insertion in "every contract" made by or on behalf of the United States of this restriction on hours of work is required by § 324. The contracts must stipulate a monetary penalty for violation, which penalty takes the form of a withholding by the government of moneys otherwise due the contractor under the terms of the contract. § 324. Finally the restriction is lifted as to employees of private contractors by § 325a, *supra,* pp. 282–283, on condition that hours worked in excess of eight be paid for at the overtime rate.

The question before us is not the power of Congress to extend the Eight Hour Law to work performed in foreign countries. Petitioners concede that such power exists. Cf. *Blackmer* v. *United States,* 284 U. S. 421; *United States* v. *Bowman,* 260 U. S. 94. The question is

rather whether Congress intended to make the law applicable to such work. We conclude, for the reasons expressed below, that such was not the intention of the legislators.

*First.* The canon of construction which teaches that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States, *Blackmer* v. *United States, supra,* at 437, is a valid approach whereby unexpressed congressional intent may be ascertained. It is based on the assumption that Congress is primarily concerned with domestic conditions. We find nothing in the Act itself, as amended, nor in the legislative history, which would lead to the belief that Congress entertained any intention other than the normal one in this case. The situation here is different from that in *Vermilya-Brown Co.* v. *Connell,* 335 U. S. 377, where we held that by specifically declaring that the Act covered "possessions" of the United States, Congress directed that the Fair Labor Standards Act applied beyond those areas over which the United States has sovereignty and was in effect in all "possessions." This Court concluded that the leasehold there involved was a "possession" within the meaning of the Fair Labor Standards Act.

There is no language in the Eight Hour Law, here in question, that gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control. There is nothing brought to our attention indicating that the United States had been granted by the respective sovereignties any authority, legislative or otherwise, over the labor laws or customs of Iran or Iraq. We were on their territory by their leave, but without the transfer of any property rights to us.

The scheme of the Act itself buttresses our conclusion. No distinction is drawn therein between laborers who are aliens and those who are citizens of the United States. Unless we were to read such a distinction into the statute we should be forced to conclude, under respondent's reasoning, that Congress intended to regulate the working hours of a citizen of Iran who chanced to be employed on a public work of the United States in that foreign land. Such a conclusion would be logically inescapable although labor conditions in Iran were known to be wholly dissimilar to those in the United States and wholly beyond the control of this nation. An intention so to regulate labor conditions which are the primary concern of a foreign country should not be attributed to Congress in the absence of a clearly expressed purpose. See Attorney General Stone's conclusion to this effect in 34 Op. Atty. Gen. 257, where he stated that the law did not apply to alien laborers engaged in altering the American Embassy in London. The absence of any distinction between citizen and alien labor indicates to us that the statute was intended to apply only to those places where the labor conditions of both citizen and alien employees are a probable concern of Congress. Such places do not include foreign countries such as Iraq and Iran.[2]

*Second.* The legislative history of the Eight Hour Law reveals that concern with domestic labor conditions led Congress to limit hours of work. The genesis of the present statute was the Act of June 25, 1868, 15 Stat. 77, which was apparently aimed at unemployment resulting from decreased construction in government navy yards. Congressional Globe, 40th Cong., 2d Sess., Part I, p. 335. In 1892, when the coverage of this Act was extended to employees of government contractors and when criminal

---

[2] Since it is unnecessary for this decision, we do not reach a conclusion as to the precise geographic coverage of the Eight Hour Law.

penalties were added, 27 Stat. 340, the considerations before Congress were domestic unemployment, the influx of cheap foreign labor, and the need for improved labor conditions in this country. H. R. Rep. No. 1267, 52d Cong., 1st Sess. The purpose of the new legislation was to remedy the defects in the Act of 1868. 23 Cong. Rec. 5723.

The Act was amended in 1912 to include *"every"* contract." [Italics supplied.] The insertion of the word "every" was designed to remedy a misinterpretation according to which the Act did not apply to work performed on private property by government contractors. 48 Cong. Rec. 381, 385, 394–95. Nothing in the legislative history supports the conclusion of respondent and the court below that "every contract" must of necessity, by virtue of the broadness of the language, include contracts for work to be performed in foreign countries.[3] A contrary inference must be drawn, we think, from a 1913 amendment which extended the law to cover persons employed "to perform services similar to those of laborers and mechanics in connection with dredging or rock excavation in any river or harbor of the United States or of the District of Columbia." 37 Stat. 726, 40 U. S. C. § 321. This Court had held that such dredgers were not covered by the phrase "laborers and mechanics" in the previously existing law. *Ellis* v. *United States,* 206 U. S. 246. In its attempt to secure equality of treatment for dredgers on the one hand and laborers and mechanics on the other, Congress would

---

[3] ". . . Words having universal scope, such as 'Every contract in restraint of trade,' 'Every person who shall monopolize,' etc., will be taken as a matter of course to mean only every one subject to such legislation, not all that the legislator subsequently may be able to catch." *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347, 357.

hardly have intended for coverage over the latter class to extend to the far corners of the globe while coverage over the former was limited to work performed in rivers or harbors "of the United States or of the District of Columbia."

The 1940 amendment which permitted work in excess of eight hours per day upon payment of overtime, 54 Stat. 884, passed without any discussion indicative of geographical scope. 86 Cong. Rec. 11216–11217.

*Third.* The administrative interpretations of the Eight Hour Law in its various phases of development afford no touchstone by which its geographic scope can be determined. Executive Order No. 8623 of December 31, 1940, 3 C. F. R. Cum. Supp. 850, issued pursuant to § 326 of the Act, suspended the law as to laborers and mechanics employed directly by the government at Atlantic bases leased from Great Britain. Such a suspension indicated, to be sure, a conclusion on the part of the President that the statute applied, or might apply, to these bases. Such action, however, may well have been predicated on the premise that the leases with the provisions discussed in our *Vermilya-Brown* decision were sufficiently subject to our control so that the Eight Hour Law would apply to them. Though numerous Executive Orders have been issued which suspend the operation of the Act in the United States, Alaska, Hawaii, Midway Island, Wake Island, etc., we have not been able to find, nor has our attention been directed, to any orders purporting to suspend its operation in countries not subject to our legislative control.[4] The order deserves no weight as an administrative determination of the Act's applicability

---

[4] See, however, Executive Orders 9251, 3 C. F. R. Cum. Supp. 1216, and 9898, 3 C. F. R. 1947 Supp. 172, in which the geographic coverage of the suspensions is not specified.

to localities unquestionably and completely beyond the direct legislative competence of the United States.

It is true that in 1905 Attorney General Moody, in a letter to the Secretary of War, expressed the opinion that the Eight Hour Law applied to public works to be constructed in the Canal Zone. 25 Op. Atty. Gen. 441. For the purpose of his opinion he treated the Canal Zone as foreign territory. *Id.,* at 444. No distinction was drawn between citizen and alien laborers. If we accept the Attorney General's assumption as to the status of the Canal Zone,[5] his opinion is in line with respondent's contention that the law is applicable to work performed in foreign countries. The opinion, however, proves too much. Although Attorney General Moody denied that incongruous results would flow from his interpretation, it would be anomalous, as we have said, for an act of Congress to regulate the hours of a citizen of Iran at work on a government project there. Attorney General Stone so indicated in 1924 when he advised the State Department that the Eight Hour Law did not apply to English workers engaged in altering the American Embassy in London. 34 Op. Atty. Gen. 257. Since the statute contains no distinction between laborers based on citizenship, Attorney General Stone's reasoning that aliens are not covered points to the conclusion that the statute does not apply to contracts which are to be performed in foreign countries. The Comptroller General has expressed agreement with this conclusion by stating that "the Eight-Hour law of June 19, 1912, was not intended to and does not apply to contracts necessarily entered into on behalf of the United States in foreign countries which may require

---

[5] See, however, the Isthmian Canal Convention, proclaimed on February 26, 1904, 33 Stat. 2234, whereby the United States had been granted all the rights, power and authority of a sovereign in the Zone.

or involve the employment of foreign laborers or mechanics in their performance." 19 Comp. Gen. 516, 518.[6]

Although the statute expressly requires the inclusion in every government public-works contract of the eight-hour provision, the Secretary of the Treasury has approved a standard form for construction contracts which contains eight-hour provisions but which provides that the use of the form will not be required in foreign countries. U. S. Standard Form No. 23, 41 U. S. C. App. § 12.23, pp. 4520, 4522. The inclusion of such provisions is also required by War Department Procurement Regulation No. 3, ¶ 346, in "all contracts subject to the provisions of the Eight Hour Law." Yet neither the instant contract nor others covering off-continent operations contain the Eight Hour Law clause.[7] Similarly the Department of State "does not consider it legally necessary to include provisions of the Eight Hour Law in contracts to be performed in foreign countries." Letter of November 8, 1948, signed by the Acting Legal Adviser "For the Acting Secretary of State," to the Attorney General.

We conclude that administrative interpretations of the Act, although not specifically directed at the precise problem before us, tend to support petitioners' contention as to its restricted geographical scope.

Since we decide that the Eight Hour Law is inapplicable to a contract for the construction of public works in a foreign country over which the United States has no direct legislative control, it is unnecessary to decide

---

[6] See also 29 Op. Atty. Gen. 488, 492 et seq.

[7] Illustrative contracts from which the clause is omitted are: W 1098 eng—1525, June 8, 1942 (Labrador and Baffin Island); W 1098 eng—1375, June 3, 1942 (Cuba); W 1098 eng—1350, April 24, 1942 (Bahamas); W 1098 eng—108, November 10, 1941 (North Africa and Palestine); W 1098 eng—2, August 2, 1941 (Greenland); W 958 eng—54, February 8, 1941 (Newfoundland); W 958 eng—50, February 4, 1941 (Bermuda).

whether the law, either directly or via the third party beneficiary contract route, gives an employee who is covered by it a cause of action against his employer for overtime wages.

*Reversed.*

MR. JUSTICE FRANKFURTER, with whom MR. JUSTICE JACKSON joins, concurring.

Because the decision in *Vermilya-Brown Co.* v. *Connell,* 335 U. S. 377, was one of statutory interpretation, I would feel bound by it were it not still open because rendered at this Term. If I felt bound by it, I would be obliged to dissent in this case.

We are here confronted by a statute which in terms covers "every contract made to which the United States . . . is a party." 37 Stat. 137, 40 U. S. C. § 324. Yet the Court construes it as inapplicable even to the work of a citizen of the United States under a contract between the United States and a corporation domiciled in the United States because "An intention so to regulate labor conditions which are the primary concern of a foreign country should not be attributed to Congress in the absence of a clearly expressed purpose." For this conclusion reliance is put upon an opinion of Attorney General Stone which refused to interpret the statute as applying to work done upon the American Embassy at London on the ground that "the enforcement of the statutory provision would disturb the agreements entered into between contractors and laborers and mechanics in a foreign country." 34 Op. Atty. Gen. 257, 260. Support is also found in an opinion of the Comptroller General which reaches a similar conclusion on the basis that "such an application of the statute might easily lead to serious difficulties in effecting contracts for necessary services in countries where social and business conditions and customs differ widely from our own." 19 Comp. Gen. 516, 518.

Such considerations, I agree, ought properly to take precedence over the literal language of the Eight Hour Law as guides to its interpretation. See *American Security Co.* v. *District of Columbia,* 224 U. S. 491. We should not, in the absence of an explicit declaration of policy, assume that Congress meant to impose our domestic standards of employment upon peoples who are not generally subject to the regulatory power of Congress. See 29 Op. Atty. Gen. 488, 492–93. But I could not regard these considerations as controlling if I felt bound by the decision of the Court in the *Vermilya-Brown* case. That case extended to foreign conditions of labor provisions of the Fair Labor Standards Act indistinguishable in effect from those of the Eight Hour Law, and it was an extension more difficult than that which the Court avoids here both because not apparently compelled by the literal terms of the Fair Labor Standards Act and because that Act is not confined in its application to contracts to which the United States is a party. Uniformity in the terms of Government contracts, indeed, is a matter so much more nearly within the usual scope of Congressional concern that Attorney General Moody required no explicit showing of Congressional purpose to conclude that the Eight Hour Law applied to contracts for the construction of the Panama Canal, even upon the assumption that the Canal Zone was to be regarded as foreign territory. 25 Op. Atty. Gen. 441.

But there are other respects in which the *Vermilya-Brown* case presented more compelling reasons than we have here for refusing to attribute to Congress an intention to regulate the conditions of work of foreign employees. Here we are required only to construe a phrase, "every contract made to which the United States . . . is a party," which is peculiar to its own context. In the *Vermilya-Brown* case, however, the Court held that our leased bases fell within the term "possessions," and that is

a term which Congress has used at least sixty-eight times. See *Vermilya-Brown Co.* v. *Connell,* dissenting opinion, 335 U. S. at 398, n. 11. And as illustrating the readiness with which the *Vermilya-Brown* case can be regarded as controlling the interpretation of all the statutes in which the term occurs, see *Spelar* v. *United States,* 171 F. 2d 208, applying the Federal Tort Claims Act to a leased base in Newfoundland. The *Vermilya-Brown* case, moreover, brushes aside official apprehensions about the interference of the United States in foreign conditions of labor far more serious than those which have influenced judgment here. All we have to guide us in the present case are general statements in opinions of two Attorneys General and a Comptroller General which required no specialized information about working conditions abroad, the knowledge that the standard contracts approved by the Secretary of the Treasury and the War Department are consistent with those opinions, and a letter from the State Department which says merely that the Department "does not consider it legally necessary to include provisions of the Eight Hour Law in contracts to be performed in foreign countries."

In the *Vermilya-Brown* case, however, the Court had before it a letter on behalf of the Secretary of State which said:

> "Any holding that the bases obtained from the Government of Great Britain on 99 year leases are 'possessions' of the United States in a political sense would not in the Department's view be calculated to improve our relations with that Government. Moreover, such a holding might very well be detrimental to our relations with other foreign countries in which military bases are now held or in which they might in the future be sought."

The State Department speaks authoritatively on the international responsibility of our Government in observ-

ing agreements with other nations, and thus it spoke in this letter. It also has knowledge, to which courts cannot pretend, of the bearing of such observance on propitious negotiations of future agreements. The letter reflects that knowledge. Even cloistered judges, however, need not be ignorant of the fact that this country has not exhausted its interest in securing bases on territory not ours.

Our decision in the *Vermilya-Brown* case in disregard of this weighty concern of the Secretary of State was followed by a petition for rehearing impressively supported by all the actively responsible executive officers of the Government. The State Department reiterated its view that the inclusion of the leased bases among the "possessions" of the United States was "unfortunate" and added that the Department "does not share the assurance of the Court that the house of assembly of Bermuda or other colonial legislatures might not undertake legislation similar to the Fair Labor Standards Act to control labor relations on the bases. It is at least worthy of note in this connection that administrative difficulties have arisen in the bases by reason of the application to contractors' employees of workmen's compensation laws of both the United States and the colonies concerned."

The petition for rehearing also brought to the attention of the Court a letter from the Secretary of the Army which read in part as follows:

"During the past nine years of employment experience in foreign countries, Army contracting officers have discovered (whether the employment was handled directly or through a CPFF contractor) that in hiring native workmen the local government in many countries will impose *maximum* wage standards which dare not be violated. These standards are sometimes fixed by statute or regulation with the force of statute, and other times by policy which has

the practical effect of law. Such governments explain that to pay native workmen according to American wage standards would seriously disrupt the local economy. Also, in many industrially undeveloped countries, local officials advise that 'excessive' wages to common laborers would jeopardize the availability of such laborers and impose serious police problems upon the state. (It should be noted that the social and economic structure of many areas, organized along tribal lines, precludes a direct dealing with individual laborers.) It appears doubtful that the Court has been sufficiently apprised of this special problem. The payment of statutory overtime to American personnel at contractors' overseas construction sites will be a minor problem in comparison with paying of statutory minimum wages *and* overtime to native workmen in the face of militant opposition by foreign governments. (It should be noted that among American personnel all laborers and mechanics, skilled and semi-skilled artisans and craftsmen, have always been paid on hourly rates with overtime benefits far exceeding statutory requirements . . . .)"

The Acting Secretary of the Navy expressed similar views:

"It has been and is the policy of this Department to employ local labor at the leased bases to the maximum extent practicable and to make its wage and labor practices with respect thereto conform as nearly as possible to the usual wage and labor practices of the particular locality. Application of the Fair Labor Standards Act to the particular areas involved may well create conditions which would adversely affect the cooperation heretofore given Navy contractors by local authorities. The continued cooperation of such authorities is, of course, highly desirable."

.

The Wage and Hour Administrator, who is ultimately responsible for enforcing the *Vermilya-Brown* decision, wrote that "even if I should be able to reach sound conclusions as to the application of the Act in these areas, I cannot help but foresee fundamental administrative difficulties in attempting to apply the Act in 'possessions' over which the United States does not exercise full sovereign rights, especially where foreign employers and alien labor are involved." In view both of the Administrator's very special relation to this matter and of the persuasiveness of his views, his letter is printed as an Appendix to this opinion.

If, in the face of these statements by executive officers charged with, and experienced in, the administration of our leased bases, the Court could reach a contrary interpretation of the broad term "possessions," it must be manifest why I could not, were I bound by precedent, join in reading the narrow phrase "every contract made to which the United States . . . is a party" in a way which departed from its literal terms when the only reason for such a departure is reluctance to attribute to Congress an intention to interfere in "labor conditions which are the primary concern of a foreign country."

## APPENDIX

U. S. DEPARTMENT OF LABOR

WAGE AND HOUR AND PUBLIC CONTRACTS DIVISIONS

WASHINGTON 25, D. C., *December 23, 1948.*

The HONORABLE PHILIP B. PERLMAN,
  *Solicitor General of the United States,*
    *Department of Justice,*
      *Washington 25, D. C.*

DEAR MR. PERLMAN: By letter dated December 22, 1948, you advise that you intend to support a petition

for rehearing to be filed in connection with the recent decision of the Supreme Court in *Vermilya-Brown Company* v. *Connell*, No. 22, This Term, decided December 6, 1948. You state that you will present to the Court the views of the Departments of State, Army, and Navy. On behalf of these Departments, and the Department of Justice, you will urge the Court to reconsider its holding that the word "possession," as used in the phrase "State, territory or possession" in Section 3 (c) of the Fair Labor Standards Act, is not a term of art, and that the Bermuda defense area leased to us in 1940 by Great Britain is within the coverage of the statute as a "possession." You request that I forward to you my views concerning the effect which this holding may have on administration and enforcement of the Act.

I think it may fairly be said that my predecessors and I, in considering the territorial aspects of wage-hour coverage in the past, have proceeded on the assumption that traditional concepts of sovereign control were implicit in the meaning of the phrase, "any Territory or possession of the United States," as that phrase is used in the Fair Labor Standards Act. In the absence of controlling court decisions, it was necessary for us to interpret the phrase for our guidance in the administration of the Act. In doing so, we not only studied the provisions of other statutes in which these terms were used and authoritative decisions of the courts construing such language in situations which were thought to be comparable, but gave particular weight to authoritative expressions of the State Department and other proper governmental agencies on the question of what areas are viewed as Territories or possessions over which the United States exercises full sovereign rights. On this basis we expressed the opinion in Interpretative Bulletin No. 2, first issued in November, 1938, and in Chapter V,

Part 776, Title 29 of the Code of Federal Regulations (section 776.1 (c)) which replaced this bulletin in July, 1947, that Alaska, Hawaii, Puerto Rico, the Canal Zone, Guam, Guano Islands, Samoa, and the Virgin Islands were Territories and possessions within the meaning of the Act.

When the question of the status of the leased bases of the type involved in the *Vermilya-Brown* case was first brought to our attention in 1942 and 1943, we expressed the view, in the opinions quoted in the Government's brief before the Supreme Court, that these bases were not Territories or possessions of the United States within the meaning of the Act. This view was subsequently modified after it appeared that the matter was being litigated in the courts and consultation with State Department officials indicated that that Department had made no ruling (the letter from that Department which is Appendix A to your brief not having been written at that time). This modification of our position is reflected by the following language which was used to advise inquiries: "Until the question has been settled by court decisions, congressional or executive action, or interpretations issued by the State Department or other proper governmental agencies, the Divisions are not in a position to assert whether the Fair Labor Standards Act applies to employees working at bases leased from the British."

As a result of the Supreme Court's decision in the *Vermilya-Brown* case, it appears that the status of a given area as a "Territory or possession of the United States" for purposes of the Act is subject to determination on the basis of considerations other than those used by the political departments of the Government, on which we have placed particular reliance in the past. I anticipate that at least two major problems will confront me as a result of the Court's ruling.

First, in order to perform my statutory duties under the Act, it will be necessary for me to decide initially, pending authoritative guidance from the courts, whether other defense base areas come within the statutory language covering Territories and possessions of the United States. If, as would seem to follow from the Court's decision, I would not be aided in this by the views of the State Department as to whether such areas are Territories or possessions in the political sense, or under traditional concepts of sovereignty, I shall be called upon to enter a field of interpretation in which our previous experience with the Act offers no reliable guides, and which may involve the meaning of international agreements on which this agency would ordinarily seek the advice of the State Department. Adequate standards for guidance in deciding such questions for purposes of administration of the Act are, in my opinion, not available to me either in the language of the statute, its legislative history, or in the *Vermilya-Brown* decision itself. The difficulty, in such circumstances, of reaching sound conclusions concerning coverage in bases such as Okinawa, Greece, Iceland, Canada, Newfoundland, the Philippine Islands, Tunisia, and Arabia is apparent. My position will be even more difficult in connection with classified military base areas.

Second, even if I should be able to reach sound conclusions as to the application of the Act in these areas, I cannot help but foresee fundamental administrative difficulties in attempting to apply the Act in "possessions" over which the United States does not exercise full sovereign rights, especially where foreign employers and alien labor are involved. Even if such difficulties may not be insuperable, vexing problems of courts with proper jurisdiction and venue to apply the criminal and civil sanctions in such cases are, it seems to me, bound

to arise if we are to undertake active enforcement in these bases. And, as you will appreciate, neither the appropriation for, nor the organization of the Wage and Hour Division were devised in contemplation of enforcement efforts in outposts such as these.

It has, of course, not been possible for us to explore fully these and other possible problems which might confront us as a result of the *Vermilya-Brown* decision, in the limited time available to us by reason of the period for filing petitions for rehearing. If the Court should grant a rehearing in the case, I shall be glad to make available to you the results of our further exploration of these questions in order that you may fully apprise the Court of my views concerning the probable effects of the present decision in terms of the over-all administration of the Fair Labor Standards Act.

Very truly yours,

WM. R. McCOMB,
*Administrator.*