**AIR LINE STEWARDS AND STEWARDESSES ASSOCIATION, INTERNATIONAL, an unincorporated labor organization, Plaintiff,**

v.

**TRANS WORLD AIRLINES, INC., a corporation, Defendant.**

United States District Court
S. D. New York.
Feb. 25, 1959.

Sturm & Perl, New York City, Lee Leibik, Ruth Weyand, Washington, D. C., for plaintiff. Alan F. Perl, New York City, and Leibik & Weyand, Washington, D. C., of counsel.

Chadbourne, Parke, Whiteside & Wolff, New York City, for defendant. Edward R. Neaher and Arthur M. Wisehart, New York City, of counsel.

HERLANDS, District Judge.

Two motions are before the Court: one by plaintiff for judgment on the pleadings; and a cross-motion by defendant for summary judgment.

Plaintiff's motion (F.R.Civ.P. rule 12 [c], 28 U.S.C.A.) is based on the proposition that the answer fails to state a defense to the claim and that the answer admits sufficient allegations of the complaint to entitle plaintiff, as a matter of law, to the relief requested. Plaintiff, Air Line Stewards and Stewardesses Association, International (hereafter called the "Union"), seeks an injunction to require defendant, Trans World Airlines, Inc. (hereafter called "TWA") to

treat the Union as the certified collective bargaining representative of all of TWA's stewards and stewardesses, regardless of their nationality and regardless of the geographic location of the segments of flights on which such personnel serve.

Claiming that it is entitled to judgment as a matter of law, defendant has cross-moved for summary judgment. F.R.Civ.P. rule 56.

Both motions involve common questions of law and will be discussed together. For the reasons set forth in this opinion, plaintiff's motion is denied; and defendant's cross-motion is granted.

Involved in the action for an injunction, are some fifty-odd stewards and stewardesses. They are foreign nationals who are based abroad and who fly on TWA planes wholly outside the continental United States and its possessions.

The Union was certified on March 6, 1947 by the National Mediation Board (pursuant to Section 2, Ninth, of the Railway Labor Act, 45 U.S.C.A. § 152, Ninth) as the bargaining representative "to represent Flight Stewards and Hostesses employed by the Transcontinental & Western Air, Inc. [now TWA] for the purposes of the Railway Labor Act."

TWA is a common carrier by air, engaged in interstate and foreign commerce. It satisfies the qualifications of 45 U.S.C.A. § 181. Section 181 makes certain pertinent provisions of the Railway Labor Act (R.L.A.) applicable to TWA.

The Union bases its action on the Board's certification, claiming that by virtue of the terms of the certification and Board practice, the certification applies to the subject personnel. This court's jurisdiction is invoked to enforce what the Union contends to be the Board's determination of certification and the rights accruing thereunder, granted to the Union under the R.L.A. By failing to bargain with the Union as the representative of the subject personnel, it is claimed that Section 2 of the R.L.A. (45 U.S.C.A. § 152, first, second, fourth, sixth, seventh, and ninth) has been violated.

Plaintiff's contentions may be summarized as follows:

*First:* Under 28 U.S.C.A. § 1337, this court has original jurisdiction to compel TWA to bargain with the Union as the certified representative of the subject personnel because the only issue is the scope of coverage of that certificate and that issue raises a question of statutory interpretation for the court's decision.

*Second:* The Board's certification of the Union includes all TWA employees in the craft or class because (A) the language of the certification itself is all-inclusive; (B) the language of section 201 of the R.L.A. (45 U.S.C.A. § 181) literally makes the Act applicable to "every" employee of an air carrier engaged in "foreign commerce," such as TWA; (C) the legislative history of the R.L.A. and cognate statutes shows that Congress intended to reach all employees of the air carrier, wherever they may fly or whatever their nationality or base of operations; (D) Section 401($l$) of the Civil Aeronautics Act [49 U.S.C.A. § 481($l$)] supports the extension of the R.L.A. to all employees of carriers holding a certificate of convenience and necessity for flights overseas or in foreign commerce; (E) Congress had the power to extend the R.L.A. to all crew members of American air carriers, and the language of Section 201 of the R.L.A. (45 U.S.C.A. § 181) evidences congressional intent to do so; and (F) to except any segment of the personnel here involved would defeat the purposes of the R.L.A. and its concept of entire class or craft representation.

Defendant's contentions may be summarized as follows:

*First:* The coverage that the Board intended by its certification is in doubt; and this question of fact precludes entry of a judgment on the pleadings for plaintiff.

*Second:* This Court lacks jurisdiction herein because (A) the Board has

sole and exclusive power to determine the extent of bargaining authority granted by the Board's certification, and the exercise of the Board's discretion is not judicially reviewable; and (B) the court cannot act with respect to the Board's certification inasmuch as the Board is not a party to the present action.

*Third:* Congress has limited the operation of the R.L.A. to the territorial limits of the United States.

Under 28 U.S.C.A. § 1337, a district court has original jurisdiction "of any civil action * * * arising under any Act of Congress regulating commerce * * *." That the R.L.A. is a statute "regulating commerce" is not in dispute. 45 U.S.C.A. § 151a. See Switchmen's Union of North America v. National Mediation Board, 1943, 320 U.S. 297, 322, 64 S.Ct. 95, 88 L.Ed. 61 (dissenting opinion). Unless some decisional or statutory impediment exists, the court would have jurisdiction over the matter.

■■ The premise of the counter-argument is that the Union seeks to change the Board's certification and to broaden its coverage by judicial rather than administrative action. Had the issues involved the competing demands of two different labor unions, each seeking to be recognized as the representative of the subject personnel, the defendant's argument and citations would be apposite. Jurisdictional controversies involving the "asserted overlapping of the interests of two crafts" and necessitating "a determination of the point where the authority of one craft ends and the other begins" are not to be solved by the courts. General Committee of Adjustment of Brotherhood of Locomotive Engineers for Missouri-Kansas-Texas Railroad v. Missouri-Kansas-Texas Railroad Co., 1943, 320 U.S. 323, 334–335, 64 S. Ct. 146, 151, 88 L.Ed. 76. Similarly, when the National Mediation Board has certified one of two or more unions as representative of a craft or class of employees, the Board determination is not subject to judicial review. Switchmen's Union of North America v. National Me-

diation Board, 1943, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61.

However, the present action is not brought by one segment of a class or craft seeking to invalidate or challenge the Board's determination of a bargaining representative. E. g., Kirkland v. Atlantic Coast Line R. Co., 1948, 83 U.S. App.D.C. 205, 167 F.2d 529, certiorari denied 1948, 335 U.S. 843, 69 S.Ct. 65, 93 L.Ed. 393. Nor is this a species of a jurisdictional dispute between unions in regard to representation that has been finally relegated to an administrative determination. Switchmen's Union of North America v. National Mediation Board, supra. See Rose v. Brotherhood of Railway and Steamship Clerks, 4 Cir., 1950, 181 F.2d 944, 946, certiorari denied 1950, 340 U.S. 851, 71 S.Ct. 78, 95 L.Ed. 623.

The matter at bar more closely resembles an enforcement proceeding; and, *arguendo*, the court will proceed on that premise. Assumedly, only one labor organization seeks to represent the subject personnel. The Union has been unqualifiedly certified as representative of the craft or class. What the Board meant when it used the words "for the purposes of the Railway Labor Act" in the certification is ambiguous.

■ One interpretation of the quoted phrase is that the Union has been certified as the representative of all workers in the class or craft to which the Railway Labor Act can validly apply. The heart of the question thus becomes the limit of the maximum coverage that the Board could have properly "intended" when it certified the Union as the representative of the subject personnel "for the purposes of the Railway Labor Act." The question consequently poses an issue of law as to the Board's jurisdiction in the sense of the Board's statutory power. What the Board actually intended as a matter of fact becomes academic in view of this court's construction of the controlling statutes—that the Board's jurisdiction does not extend to employees of TWA who are foreign nationals, based abroad,

and flying wholly outside the continental United States and its possessions.

It would be an empty gesture to remit the parties to the Board [1] for the simple reason that what plaintiff seeks is beyond the Board's statutory power.

There are no controverted material issues of fact [2] that would prevent entry of a summary judgment. The court is mindful that caution must be exercised in deciding "issues of public moment" on pleadings and affidavits. See Eccles v. Peoples Bank, 1947, 333 U.S. 426, 434, 68 S.Ct. 641, 645, 92 L.Ed. 784. The court, however, is not reviewing administrative judgment, discretion or expertise. The court must perform its judicial function of statutory interpretation.

The literal wording of title 45 U.S. C.A. § 181 is relied upon heavily by plaintiff in its contention that the statute applies to *all* employees of an air carrier engaged in foreign commerce, including employees who are foreign nationals and who are based abroad and fly entirely outside the territorial limits of the United States and its possessions. The following is the pertinent language:

"All of the provisions of sections 151, 152, and 154–163 of this title are extended to and shall cover every common carrier by air engaged in * * * foreign commerce, and every carrier by air transporting mail for or under contract with the United States Government and every air pilot or other person who performs any work as an employee * * * of such carrier * * *."

That TWA is a common carrier by air engaged in foreign commerce is not in dispute.

Stripped of diverting detail, the question may be formulated as follows: Does section 181 contain its own built-in definition of the words "every" and "employee" independent of the language contained in section 151 or must the meaning of the words "every" and "employee" contained in section 181 be determined in the light of and subject to the qualifications contained in section 151?

That section 181 must be integrated and harmonized with section 151 becomes manifest upon a consideration of the statutory provisions themselves.

The structure of section 181 parallels and was modelled after that of section 151. Thus, paragraph "Fifth" of section 151, in using the term "employee," states that the term includes "every person in the service of the carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission." Section 181 contains the following borrowed and paraphrased language: "every air pilot or other person who performs any work as an employee or subordinate official of such carrier or carriers, subject to its or their continuing authority to supervise and direct the manner of rendition of his service."

Any doubt as to whether section 181 should not be read as possessing an independent built-in definition of "every" and "employee" is laid to rest by the explicit provisions of sections 181 and 182. Section 181 opens with the following quoted words: "All of the provisions of sections 151, 152, and 154–163 of this title are *extended to and shall cover*" not only every air carrier engaged in foreign commerce but also the employees of such carriers. (Emphasis

---

**1.** Title 45 U.S.C.A. § 152, Ninth, is not made expressly applicable to a dispute between a carrier and the certified bargaining representative. The section and applicable regulations (29 C.F.R. 1202.3) speak of a dispute "among carrier's employees" as to the designation of a bargaining representative. The court's attention has not been called to any case where the certified bargaining repre-

sentative of the employees was either permitted or refused permission to invoke this section to determine the scope of the certification.

**2.** While the motion papers may raise an issue of fact as to the actual intention of the Board and its official position, that issue of fact is immaterial to the decisive question of law.

added.) Section 182 declares with sharp definitiveness:

"The duties, requirements, penalties, benefits and privileges prescribed and established by the provisions of sections 151, 152 and 154–163 of this title shall apply to said carriers by air *and their employees in the same manner and to the same extent as though* such carriers and *their employees* were *specifically included within the definition* of 'carrier' and *'employee,'* respectively, in section 151 of this title." (Emphasis added.)

■ Clearly, Congress intended to make air carriers and their employees integral parts of the legislative pattern of the Railway Labor Act. Where deviations were deemed necessary, they were covered by separate provisions (sections 183–188). Sections 151, 152, and 154–163 were incorporated by express reference and extension. This accomplished a carry-over *mutatis mutandis* of the definitions (section 151); the specification of duties and disputes procedures, and details of labor-management regulation and collective bargaining (section 152); the functions and jurisdiction of the National Mediation Board (sections 154 and 155); the procedure in changing rates of pay, etc. (section 156); arbitration proceedings (sections 157–159); and the Emergency Board (section 160).

The basic statute is, therefore, the Railway Labor Act, to which sections 181–188 are an amendment ("Carriers By Air" Amendment). The Railway Labor Act, title 45 U.S.C.A. § 151, First, defines the carriers to which it applies as "any * * * carrier by railroad, subject to the Interstate Commerce Act [49 U.S.C.A. chapter 1, §§ 1–27]. * * *." Title 45 U.S.C.A. § 151, Fifth, defines "employee" as a person in the service of a carrier "who performs any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission." The Interstate Commerce Act [49 U.S.C.A.

chapter 1] is limited in its application to common carriers engaged in interstate and *foreign* transportation *"but only in so far as such transportation * * * takes place within the United States."* 49 U.S.C.A. § 1(1) (c), (2). (Emphasis added.)

■ On the basis of the foregoing provisions, it has been adjudicated "that *as applied to railroads* the Railway Labor Act does not extend beyond the United States." Air Line Dispatchers Association v. National Meditation Board, 1951, 89 U.S.App.D.C. 24, 189 F.2d 685, 690, certiorari denied 1951, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (Emphasis added.)

In view of the interlocking provisions between the Railway Labor Act proper and the Carriers By Air Amendment, the more convincing conclusion is "that the territorial scope of the Act *in its application to air transport* was like that applicable to railroads." Circuit Judge Fahy, for a unanimous court, in Air Line Dispatchers Association, supra, 189 F.2d at page 690. (Emphasis added.) The decision in Air Line Dispatchers Association was followed in Air Line Stewards and Stewardesses Association, International v. Northwest Airlines, Inc., D.C. Minn.1958, 162 F.Supp. 684.

Seizing upon the words "foreign commerce" in 45 U.S.C.A. § 181, plaintiff argues that section 181 is broad enough to encompass "every" employee of an airline covered by the statute, regardless of the fact that he is a foreign national based outside of the United States and engaged exclusively in flight segments that are entirely outside of the United States.

Although "foreign commerce" is not defined by the statute, section 151, Fourth, does define "commerce" *inter alia* as "commerce * * * between any State, Territory, or the District of Columbia and any foreign nation." This definition of "commerce" is as broad as the usual definition given to "foreign commerce." For example, the Civil Aeronautics Act, 49 U.S.C.A. § 401(20)

(c) [3] defines "foreign air commerce" as commerce between "a place in the United States and any place outside thereof."

■ By adding the adjective "foreign" to "commerce" in 45 U.S.C.A. § 181, Congress did not intend to broaden the statutory coverage to include a previously excluded segment of commerce, nor did Congress intend to regulate foreign-based alien employees of airlines.

The function of the entire phrase—"every common carrier by air engaged in interstate or foreign commerce"—is to delimit or describe the air carriers that are to be regulated. The substantive provisions defining the scope of regulation are found in the basic statute (45 U.S.C.A. §§ 151, 152, 154–163) and in 45 U.S.C.A. § 182ff.

Plaintiff also argues that 45 U.S.C.A. § 181 should be construed as expressing a legislative intent to give that statute extra-territorial effect because Congress has the power to extend the geographical coverage of the R.L.A. to all TWA employees, whatever their nationality or base of operations or wherever they fly.

■ In prescribing standards of conduct for American citizens, Congress has the power to project the impact of its laws beyond the territorial boundaries of the United States. Vermilya-Brown Co., Inc. v. Connell, 1948, 335 U.S. 377, 381, 407–408, 69 S.Ct. 140, 93 L.Ed. 76; Foley Bros., Inc. v. Filardo, 1949, 336 U.S. 281, 284–285, 69 S.Ct. 575, 93 L.Ed. 680; Steele v. Bulova Watch Co., Inc., 1952, 344 U.S. 280, 282, 73 S.Ct. 252, 97 L.Ed. 252.

Had Congress so intended, it could have extended the coverage of the R.L.A. to all the crew members of American airplanes, flying domestically and overseas under a certificate of public necessity and convenience. The problem in this case concerns the construction of a specific statute, and not the limitations upon the legislative power itself.

■ That a Federal statute will not extend beyond the boundaries of the United States unless a contrary legislative intent clearly appears is an accepted canon of construction. Steele v. Bulova Watch Co., Inc., supra, 344 U.S. 285, 73 S.Ct. 255; Foley Bros., Inc. v. Filardo, supra, 336 U.S. 285, 69 S.Ct. 577.

Vermilya-Brown, supra, dealt with employees of American contractors who were engaged in the construction of an American military base in Bermuda, the land for which was leased from Britain. The employees sought to recover unpaid overtime compensation allegedly due them under the Fair Labor Standards Act. The statute, by its terms (29 U.S.C.A. § 203[b, c]), applies to commerce "among the several States or between any State and any place outside thereof." "State" is statutorily defined to mean "any State * * * or any Territory or possession of the United States." The Court (Vinson, C. J., and Jackson, Frankfurter, and Burton, JJ., dissenting) held that the leasehold interest granted to the United States made the Bermuda base a United States "possession" and that the F.L.S.A. applied.

Plaintiff relies heavily on Vermilya-Brown and some of the Court's language therein. The decision, however, is not as broad as plaintiff would read it. Mr. Justice Reed, who wrote for the majority in Vermilya-Brown, subsequently called attention to the narrow scope of the Vermilya-Brown holding in Foley Bros., Inc. v. Filardo, supra, and in his dissent in Steele v. Bulova Watch Co., Inc., supra.

Writing for a unanimous Court in United States v. Spelar, 1949, 338 U.S. 217, 70 S.Ct. 10, 94 L.Ed. 3, Mr. Justice Reed again called attention to the restricted significance of the Vermilya-Brown case and refused to extend the remedies afforded under the Federal Tort Claims Act, 28 U.S.C.A. § 2680(k) to a person killed on a leased United

---

3. The cited reference to the Civil Aeronautics Act is to the section as numbered prior to the passage of the Fed-

eral Aviation Act of August 23, 1958, 72 Stat. 806, 49 U.S.C.A. § 1301 et seq.

States base in Newfoundland. The Federal Tort Claims Act was, by its terms, inapplicable to "any claim arising in a foreign country." Mr. Justice Reed said (338 U.S. at page 222, 70 S.Ct. at page 12):

> " \* \* \* we there [Vermilya-Brown] held *no more* than that the word 'possessions' does not necessarily imply sovereignty, and concluded \* \* \* that the leased bases \* \* \* were to be included as 'possessions' in the sense in which that word was used in that statute." (Emphasis added.)

The language in Vermilya-Brown, supra, 335 U.S. at pages 389–390, 69 S.Ct. at pages 146–147, now relied on by the Union, is much broader than the actual holding of the case.

The Supreme Court's treatment of a closely related situation in Foley Bros., Inc. v. Filardo, supra, also indicates a more restricted reading of Vermilya-Brown than that urged by the Union. In Foley Bros., Inc., the Court was unanimous in reversing a decision by the New York Court of Appeals [297 N.Y. 217, 78 N.E.2d 480] that the American employees of an American contractor constructing bases in Iraq and Iran could recover for overtime pay under the Eight Hour Law (40 U.S.C.A. § 324 et seq.). That statute uses such all-inclusive language as *"every* contract made to which the United States \* \* \* is a party" and "the wages of *every* laborer \* \* \* employed by any contractor \* \* \* engaged in \* \* \* *any* contract." (Emphasis added.) Mr. Justice Reed said (336 U.S. at page 285, 69 S.Ct. at page 577):

> "The canon of construction which teaches that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States, Blackmer v. United States, supra, 284 U.S. [421] at [page] 437, 52 S.Ct. [252] at page 254, 76 L.Ed. 375, is a valid approach whereby unexpressed congressional intent may be ascertained. It is based on

the assumption that Congress is primarily concerned with domestic conditions. We find nothing in the Act itself, as amended, nor in the legislative history, which would lead to the belief that Congress entertained any intention other than the normal one in this case."

In words that have a clear significance to the problem in the case at bar, Mr. Justice Reed declared (336 U.S. at page 286, 69 S.Ct. at page 578):

> "The scheme of the Act itself buttresses our conclusion. No distinction is drawn therein between laborers who are aliens and those who are citizens of the United States. Unless we were to read such a distinction into the statute we should be forced to conclude, under respondent's reasoning, that Congress intended to regulate the working hours of a citizen of Iran who chanced to be employed on a public work of the United States in that foreign land. Such a conclusion would be logically inescapable although labor conditions in Iran were known to be wholly dissimilar to those in the United States and wholly beyond the control of this nation. An intention so to regulate labor conditions which are the primary concern of a foreign country should not be attributed to Congress in the absence of a clearly expressed purpose. \* \* \* The absence of any distinction between citizen and alien labor indicates to us that the statute was intended to apply only to those places where the labor conditions of both citizen and alien employees are a probable concern of Congress. Such places do not include foreign countries such as Iraq and Iran."

Mr. Justice Frankfurter, joined by Mr. Justice Jackson, concurring in Foley Bros., Inc., supra, expressed the same apprehension over the effect of extending American labor standards to foreign workers in their own lands. He agreed with the majority that an intention to

regulate labor conditions which are the primary concern of a foreign government should not be attributed to Congress in the absence of a clear expression of that legislative objective. He adverted to the possibility that the interposition of the statute might upset agreements between American concerns and local workers, and that difficulties might arise where the local economies differed widely from our own. Mr. Justice Frankfurter concluded (336 U.S. at page 292, 69 S.Ct. at page 580):

> "Such considerations, I agree, ought properly to take precedence over the literal language of the Eight Hour Law as guides to its interpretation. * * * We should not, in the absence of an explicit declaration of policy, assume that Congress meant to impose our domestic standards of employment upon peoples who are not generally subject to the regulatory power of Congress."

In Foley Bros., Inc., supra, the Supreme Court flatly refused to read the statutory words *"every* contract" literally.

In Steele v. Bulova Watch Co., Inc., supra [344 U.S. 280, 73 S.Ct. 257], involving the "Bulova" trademark, the majority of the Court held (Reed and Douglas, JJ., dissenting) that under the Lanham Trade-Mark Act's sweeping reach into "all commerce which may lawfully be regulated by Congress", 15 U.S.C.A. § 1127, the federal courts had jurisdiction to issue an injunction against a citizen and resident of the United States, although all of the acts of infringement were consummated in Mexico. The Supreme Court (344 U.S. at page 289, 73 S.Ct. at page 257) has carefully pointed out that the relief granted would not impugn foreign law or in any way interfere with the sovereignty of another nation.

The teaching of the Supreme Court decisions just considered is that, in resolving the question whether a particular federal statute is to be construed as possessing extra-territorial effect, the following factors must be evaluated: (1) whether the statutory language is vague or explicit as to the reach of the statute; (2) whether the statutory policies underlying the legislation were deliberately and consciously shaped with the existence or peculiarities of the foreign area in mind; (3) whether the legislative history of the statute evinces any specific congressional intention with respect to the subject of extra-territoriality; (4) whether the vindication of the public policy to be subserved requires extra-territorial operation; (5) whether the extra-territoriality of the statute is necessary for the effective regulation of the actions of our citizens; (6) whether the defendant's acts were a device to evade the thrust of the statute by attempting to create a privileged sanctuary beyond our borders; (7) whether the legislation is a criminal statute or requires the upholding of the sovereign power of the United States; (8) whether the extra-territorial trade practices radiate unlawful consequences here notwithstanding that they were initiated or consummated outside the United States; (9) whether a substantial number of American citizens are within the extra-territorial area sought to be regulated; (10) whether the extra-territorial acts sought to be regulated occur on a geographical area over which the United States has some measure of territorial or legislative control, although the area is not within the sovereignty of the United States; (11) whether the same policies suited to the United States are adaptable to the local conditions of the foreign area; (12) whether the defendant's particular operations and their effects were confined within the territorial limits of a foreign nation; (13) whether the rights of other nations or their nationals may be infringed; (14) whether the alleged violation of the statute is grounded on a foreign nation's sovereign acts; (15) whether the extra-territorial operation of the statute would impugn foreign law or tend to interfere with the sovereignty, institutions, social conditions or com-

mercial practices of another nation; (16) whether the defendants or other persons whose conduct is to be directly affected are American citizens or foreign nationals, or residents of the United States or some other country.

■ Appraising the statute (45 U. S.C.A. § 181) in the light of the foregoing factors, the court concludes that the statute does not apply to foreign nationals, based abroad and flying wholly without the continental limits of the United States and its possessions.

The foregoing conclusion is reinforced by the circumstance that the statute involved herein—unlike the legislation considered by the Supreme Court in the cases discussed above—does have an explicit geographical ambit, one limited to the continental United States (supra, 173 F.Supp. at page 374. *A fortiori* the statute does not possess extra-territorial operation.

The court's attention has not been called to any phase of the legislative history of this statute that attenuates the opinion expressed by Judge Fahy in Air Line Dispatchers Ass'n, supra, 189 F.2d 690—that the legislative data, although somewhat ambiguous, confirms the view that the territorial scope of the statute was the same in its application to railroads and air carriers.

The Union further contends that the Civil Aeronautics Act, section 401(*l*) [49 U.S.C.A. § 481(*l*)],[4] read in conjunction with the R.L.A., makes the R.L.A. applicable to all overseas and international employees of each air carrier holding a certificate of public convenience and necessity for flights overseas and in foreign commerce. This argument is untenable, as will be shown.

■ The Civil Aeronautics Act (49 U.S.C.A. § 401 et seq.) regulates a variety of aeronautical problems. Subchapter IV (sections 481–496) provides for the economic regulation of air carriers. These sections regulate in detail such matters as permits to foreign air carriers, tariffs, rates for carriage, transportation of mail, and the finances, business organization, and competitive activities of air carriers. On the other hand, labor-management problems of the air carrier industry did not receive the same comprehensive treatment in the Civil Aeronautics Act. Instead, Congress continued the regulations set forth in the Air Carrier Amendment to the R.L.A. Congress specifically provided in title 49 U.S.C.A. § 481(*l*) (4) that every holder of a certificate of public convenience and necessity "shall comply with sections 181–188 of Title 45," the Air Carrier Amendment to the R.L.A. In this manner, whatever regulations were applicable to air carriers as defined in the Air Carrier Amendment, were made applicable to air carriers as a condition for holding the certificate. This reference does not indicate an intent to broaden the ambit of the Air Carrier Amendment.

Furthermore, the setting of paragraph "(4)" in subsection "(*l*)" of title 49 U.S.C.A. § 481, disproves rather than supports the Union's contention. Title 49 U.S.C.A. § 481(*l*), paragraph (1) provides that every air carrier shall maintain "rates of compensation, maximum hours and other working conditions and relations" of all of its "pilots and copilots who are engaged in interstate air transportation within the continental United States * * * so as to conform with decision numbered 83 made by the National Labor Board on May 10, 1934."

Paragraph (2) refers to "pilots and copilots who are engaged in overseas or foreign air transportation"; and as to them, only "rates of compensation" need conform to the above-referred to N. L. B. decision. Paragraph (3) shows that the omission of "other employees" in paragraphs (1) and (2) was deliberate. These provisions show a congressional awareness of and intention to differentiate between domestic and "overseas or foreign air transportation," and between

---

4. Repealed and renumbered by the Federal Aviation Act of August 23, 1958, 72 Stat. 806.

"pilots and copilots" and "other employees." Where Congress wished to grant specific benefits to selected categories of air carrier employees beyond those rights that are afforded generally by the Air Carrier Amendment to the R.L.A., Congress made explicit provision therefor.

Such legislative history as has been presented by the Union (i. e., remarks by a private person rather than an authoritative source of congressional sentiment) would seem to indicate that whatever benefits the Civil Aeronautics Act was to afford were intended for American pilots and American personnel. Hearings, Senate, Subcommittee of Committee on Interstate and Foreign Commerce, in S. 3659, 75th Cong. 3rd Sess., at pp. 48, 64–65, 295.

In this case, as it did in Air Line Stewards And Stewardesses Association, International v. Northwest Airlines, Inc., D.C.D.Minn. 1958, 162 F.Supp. 684, 688, the Union argues "that no extraterritorial application of the Act is involved when the air carrier flies ships of United States registry and the employees are members of the crews of such aircraft. In effect, petitioner's position is that the doctrine of the 'law of the flag', known to maritime commerce, applies to aircraft with the result that such aircraft are comprehended within the term, territories of the United States, to which the Act applies."

This court agrees with the conclusion reached by District Judge Donovan in Air Line Stewards And Stewardesses Association, International, supra, 162 F. Supp. 688, that the maritime analogy [5] is inapplicable. Chicago & Southern Air Lines v. Waterman S. S. Corp., 1948, 333 U.S. 103, 107, 108, 68 S.Ct. 431, 92 L.Ed. 568, quoted in Air Line Stewards and Stewardesses Association, International, supra, 162 F.Supp. 688.

5. Even in maritime cases involving the construction of Federal statutes, e. g., the Jones Act, 46 U.S.C.A. 688, the courts have utilized a "method of approach to the problem" similar to that

In view of the foregoing, plaintiff's motion for judgment on the pleadings is denied; defendant's cross-motion for summary judgment is granted.

Settle order on notice.

employed in the case at bar. Bartholomew v. Universe Tankships, Inc., 2 Cir., 263 F.2d 437; Lauritzen v. Larsen, 1953, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254.