# United States Court of Appeals
## For the First Circuit

---

No. 00-2372

UNITED STATES OF AMERICA,

Appellee,

v.

ALBERTO DE LEÓN,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

---

Before

Boudin, Chief Judge,

Torruella and Selya, Circuit Judges.

---

Irma R. Valldejuli, by appointment of the court, for appellant.

Nelson Pérez-Sosa, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, and Jorge E. Vega-Pacheco, Assistant United States Attorney, Chief, Criminal Division, were on brief for the United States.

---

November 2, 2001

---

BOUDIN, Chief Judge.  In this case, Alberto De León appeals from his conviction for attempting to reenter the United States after deportation.  The facts are undisputed.  De León, a citizen of the Dominican Republic, first entered the United States in 1980.  In 1995, he was convicted in state court of possession of heroin with intent to distribute and was sentenced to prison.  Following his release in July 1997, he was deported based upon his conviction for drug dealing.

On May 16, 1999, a U.S. Coast Guard cutter intercepted a small yawl about 15 nautical miles off the northwest coast of Puerto Rico (all references are to nautical miles).  The yawl was in international waters, since U.S. territorial waters extend only 12 miles from shore and, at the time, the U.S. contiguous zone also extended only 12 miles from shore.[1]  The yawl flew no flag and had no lights, registration number or other markings.  De León was one of the passengers on the yawl.

When approached by the cutter, the yawl turned away sharply but then halted and began to sink.  The yawl turned out to be carrying 72 Dominican nationals, and various passengers

---

[1]The contiguous zone is an area in which the United States claims certain rights short of sovereignty.  In August 1999, the President signed a proclamation to extend the contiguous zone to 24 miles from shore, but this occurred after the events important to this case.  Presidential Proclamation No. 7219, 64 Fed. Reg. 48,701 (Aug. 2, 1999).

admitted that the yawl was attempting to transport them to Puerto Rico. The passengers were taken by the Coast Guard to Puerto Rico. There, an investigation revealed that De León had been previously deported as an aggravated felon and had not received permission from the Attorney General to enter the United States.

A grand jury indicted De León on one count under 8 U.S.C. § 1326 (1994). That provision makes it a crime for an alien who has previously been deported to enter, attempt to enter, or be found in the United States unless certain conditions are met (such as receiving express consent from the Attorney General to apply for admission). Id. § 1326(a). The government also invoked the more severe penalties that the statute provides where the previous deportation occurred subsequent to commission of an aggravated felony. Id. § 1326(b)(2). De León moved to dismiss the indictment, arguing inter alia that he could not be convicted for an attempt to enter based on acts that occurred entirely outside the United States.

The district court denied the motion, and De León then pled guilty to attempting to enter the United States in violation of the statute and was sentenced to 70 months in prison. However, in his plea agreement De León reserved the

right to appeal on his claim that the statute did not apply to conduct that occurred wholly outside the United States. That is the only issue presented to us on this appeal.[2]

Apart from his claim as to territorial reach, there is no dispute that De León violated the statute. "Attempt," here as elsewhere, is a specific intent crime in the sense that an "attempt to enter" requires a subjective intent on the part of the defendant to achieve entry into the United States as well as a substantial step toward completing that entry. United States v. Gracidas-Ulibarry, 231 F.3d 1188, 1195-96 (9th Cir. 2000) (en banc). However, as with most federal criminal statutes, there is no requirement that the defendant additionally know that what he proposes to do--i.e., attempt to enter the United States--is for him criminal conduct. 1 LaFave & Scott, Substantive Criminal Law § 5.1(d) (1986).

The adequacy of the factual basis for De León's plea is not disputed, and any such dispute would be foreclosed, absent extraordinary circumstances, by the guilty plea itself. Acevedo-Ramos v. United States, 961 F.2d 305, 307 (1st Cir.), cert. denied, 506 U.S. 905 (1992). As it happens, the evidence

---

[2]Although De León also briefed a claim that his prior deportation was invalid, he did not present that issue in the district court or preserve it in the face of his guilty plea. In oral argument, defense counsel in this court withdrew this claim of error.

was ample to show that De León was on a vessel seeking to make a surreptitious entry into the United States, and--given the state and behavior of the vessel and the statements of other passengers--it is easy to infer that De León knew full well where he was headed and was on board for that purpose.

De León does not argue, nor could he, that Congress lacks constitutional authority to make criminal the conduct to which he pled guilty. Although all of the alleged acts occurred outside of the United States, its territorial waters and its then-defined contiguous zone, the acts were deliberately directed to producing an effect within the United States. The constitutional power of Congress to criminalize such conduct is not in doubt.[3] Instead, De León argues Congress is presumed not to intend an extraterritorial application of its general criminal statutes. Alternatively, he says that to do so here would violate a treaty whose provisions are set forth below.

It is true that "'legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" Foley Bros.,

---

[3]See Blackmer v. United States, 284 U.S. 421, 436-38 (1932); see also Restatement(Third) of the Foreign Relations Law of the United States § 403(3) (1987); Hartford Fire Ins. Co. v. California, 509 U.S. 764, 795-96 (1993); Nippon Paper Indus. Co., 109 F.3d 1, 4 (1st Cir. 1997); United States v. Plummer, 221 F.3d 1298, 1305-07 (11th Cir. 2000).

<u>Inc.</u> v. <u>Filardo</u>, 336 U.S. 281, 285 (1949).  The policy reasons are obvious:  one is "the common sense notion that Congress generally legislates with domestic concerns in mind."  <u>Smith</u> v. <u>United States</u>, 507 U.S. 197, 204 n.5 (1993).  And the presumption also "serves to protect against intended clashes between our laws and those of other nations . . . ."  <u>EEOC</u> v. <u>Arabian Am. Oil Co.</u>, 499 U.S. 244, 248 (1991).

Here, statutory language taken alone does not disclose Congress' intent; although the statute makes criminal "attempts to enter" without limitation as to where the attempts occur, that would be true of many provisions in the Criminal Code, <u>e.g.</u>, 18 U.S.C. § 1028 (1994) (false ID documents), but few of those provisions would be read automatically to apply to conduct occurring solely in France or Norway.  Nor does the government point to any legislative history that might suggest a special concern with attempts to enter the United States that occur on the high seas or in foreign countries but which never reach U.S. territory.  At the same time, this seems to us a singularly easy case to conclude that Congress did mean to reach De León's conduct.

In the ordinary situation, Congress has little reason to care whether citizens in other countries behave in ways that would be forbidden in this country.  But where the crime

involves a prior deportee's effort to re-enter the United States illegally, the federal interest is just about the same as that which leads Congress to punish one who "enters . . . or is at any time found in, the United States" after deportation. 8 U.S.C. § 1326(a)(2). Why would Congress want someone caught several miles outside territorial waters, who is shown to be attempting to enter illegally, to be freed and given a second chance to make a more successful entry?

No challenge is made here to the lawfulness of the seizure. Had the yawl not been classed as a stateless vessel, this could have affected the authority of the Coast Guard to arrest De León at sea--absent permission from the flag state. See 46 U.S.C. app. § 1903(c)(1)(C) (Supp. II 1996). But such limitations on place of arrest would not alter Congress' interest in criminalizing De León's conduct or in prosecuting him if the government could lawfully acquire custody.

The more interesting question is whether the statute would apply if the acts comprising the "attempt" took place solely within the territory of a foreign state. In some cases, the conduct--if distant and preliminary--might easily fail to constitute an attempt, see United States v. Doyon, 194 F.3d 207, 211 (1st Cir. 1999); but one can imagine other cases where an attempt would be made out (e.g., suppose De León had been caught

-8-

in Canada a mile from the border and admitted that he was en route to Detroit).  Without suggesting any doubt about Congress' power to punish such conduct, we need not decide now whether there is any such limitation on the statute's reach.

This brings us to De León's argument based on the Convention on the Territorial Sea and the Contiguous Zone.  The gist of the argument is that by ratifying the Convention--which affirmatively authorizes the enforcement of national immigration laws in its contiguous zone and territorial sea--the United States has impliedly agreed that it will not apply its laws to conduct occurring beyond the zone, at least as to "customs, fiscal, immigration or sanitary regulations . . . ."

The Convention, ratified by the Senate in 1961 and entered into force in 1964, pertinently reads as follows:

> (1) In a zone of the high seas contiguous to its territorial sea, the coastal State may exercise the control necessary to:
>
>> (a) Prevent infringement of its customs, fiscal, immigration or sanitary regulations within its territory or territorial sea;
>>
>> (b) Punish infringement of the above regulations committed within its territory or territorial sea.
>
> (2) The contiguous zone may not extend beyond twelve miles from the baseline from

> which the breadth of the territorial sea is
> measured [_i.e._, the shore].

Convention on the Territorial Sea and the Contiguous Zone, Apr. 29, 1958, art. 24, 15 U.S.T. 1606, 1612.

It is unclear how far the Convention is concerned with authority to proscribe conduct as opposed to authority to enforce. The introductory language--the coastal state "may exercise the control necessary to"--suggests enforcement measures, giving the coastal state (for example) the power to halt and arrest vessels of other states engaged in infringing the named categories of rules. _Cf._ Dean, _The Geneva Conference on the Law of the Sea: What Was Accomplished_, 52 Am. J. Int'l L. 607, 624 (1958) ("Thus, hot pursuit of a vessel which has committed an offense within the territorial sea may commence even though the vessel is first sighted, not within the territorial sea, but within the contiguous zone").

More important, assuming that the Convention also provides or ratifies a power to regulate certain conduct within the contiguous zone, the Convention nowhere purports to _bar_ the application of federal statutes to conduct, whether within or beyond the contiguous zone, that has a substantial adverse effect within the United States. That power was assumed to exist well before the Convention, _e.g._, Logan Act, 18 U.S.C. § 954 (1994), and well after, Foreign Trade Antitrust Improvements

-10-

Act of 1982, 18 U.S.C. § 6a (1994), and it is confirmed both by case law and commentary.  <u>See</u> note 3, above.  At most, prescriptions beyond the contiguous zone do not get the diplomatic protection that the Convention may afford if and when foreign states object.

<u>Affirmed</u>.