AMLON METALS, INC., Amlon Metals, Ltd., d/b/a Euromet, and Wath Recycling, Ltd., Plaintiffs,

v.

FMC CORPORATION, Defendant.

No. 91 Civ. 3857 (WCC).

United States District Court, S.D. New York.

Oct. 16, 1991.

As Amended Nunc Pro Tunc Dec. 13, 1991.

Stroock & Stroock & Lavan (Charles G. Moerdler, Robert J. Zastrow, Karen Jore, Lisa Rosenthal, Gregory R. Belcamino, of counsel), New York City, for plaintiffs.

Gallagher & Gosseen (Robert A. Faller, of counsel), Mineola, N.Y., Hangley, Connolly, Epstein, Chicco, Foxman & Ewing (Neil G. Epstein, Carol L. Press, John P. Lavelle, of counsel), Philadelphia, Pa., for defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

This action stems from a commercial contract for the recycling of copper residue produced by defendant FMC Corporation ("FMC"). The matter is currently before the Court on FMC's motion to dismiss plaintiffs' claims under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 et seq. (1982 & Supp. III 1985), and Alien Tort Statute, 28 U.S.C. § 1350 (1982 & Supp. III 1985), on the grounds that this Court lacks jurisdiction over the claims pursuant to Fed.R.Civ.P. 12(b)(1) and that the claims fail to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6).

### Background

Plaintiff Amlon, a New York Corporation with its principal place of business in New York, is the sole American agent for plaintiffs Wath, a United Kingdom corporation with its principal place of business in Wath-on-Dearne, South Yorkshire, and Euromet, a United Kingdom corporation with its principal place of business in London. Complaint ¶¶ 3-5, 9. Amlon acquires metal residues, which are shipped to Wath for drying and other processing. Complaint ¶ 9. The profits and losses are divided equally between Amlon and Euromet. Complaint ¶ 9.

In January 1988, Amlon and FMC, a Delaware corporation with its principal place of business in Chicago, entered into negotiations concerning the possible reclamation of copper residue produced by a pesticide plant operated by FMC in Baltimore, Maryland. Complaint ¶¶ 6, 10.

In August 1988, Amlon and FMC entered into a contract under which the parties agreed, *inter alia,* that the copper residue would be treated for metallic reclamation purposes, that the material would be free from harmful impurities as per a sample tested earlier by Amlon, that the material was not a hazardous waste, and that the material typically contained 33% copper. Complaint ¶¶ 15-16.

Problems between Amlon and FMC developed shortly after the contract was signed. The shipment of material was to take place in October. Amlon had arranged for containers sufficient to handle the 140 tons of material it had anticipated. Complaint ¶ 19. The delivery actually made to Wath was between three and four tons, a quantity so small that it caused Wath some processing difficulties. Complaint ¶ 19. The material itself was apparently free from harmful impurities. Complaint ¶ 19.

In May 1989, Amlon procured some 20 containers and caused them to be delivered to FMC's Baltimore plant in preparation for the shipping of additional copper residue to Wath. Complaint ¶ 25. Unbeknownst to Amlon or Wath, the drivers of the trucks that took the containers from FMC's plant to the cargo ship were told to wear respirators and the containers had been marked "corrosive" before leaving FMC's hands. Complaint ¶¶ 25-27.

When the containers arrived in Leeds England on June 9, 1989, Wath's personnel noticed a strong odor coming from the containers. Complaint ¶ 33. Thirteen of the containers were shipped to Wath's premises while seven remained at Leeds. Amlon contacted FMC and was told that the smell was probably due to xylene (an EPA-listed hazardous substance), which FMC stated was present in concentrations of 0 to 100 parts per million. Complaint ¶¶ 33-34. When the smell did not dissipate over the

course of the week, Amlon again contacted FMC, and was told that xylene might be present in concentrations five to fifteen times higher than FMC had stated previously. Complaint ¶¶ 37–38. On June 16, Amlon rejected the seven containers that were still in the British Rail depot at Leeds and reserved the right to hold FMC responsible for the removal of the material at Wath's premises, which at that point had been mixed with other residues. Complaint ¶¶ 40–41.

Thereafter, Wath notified the British government of the problems of which· it was then aware and commenced its own analysis of the material. Complaint ¶ 45. Its tests revealed that the material contained a number of organic chemicals, including xylene (in concentrations up to ten times higher than FMC had disclosed in its second communication), 7–hydrogen (an allegedly carcinogenic pesticide intermediary) and chlorinated phenols (which may form dioxin when exposed to heat and a catalyst).

Upon learning of the situation, the Health and Safety Executive of the United Kingdom required Wath to drum the material and Wath placed it in steel drums at its premises, where it remains today. Complaint ¶¶ 45, 54.

On December 20, 1989, plaintiffs brought suit against FMC in the Commercial Court of the Queen's Bench Division of the British High Court of Justice. The Commercial Court granted FMC's motion to dismiss on the grounds that all the actions claimed to be taken by FMC took place in the United States and U.S. law would apply.

On June 7, 1991, plaintiffs filed the complaint that gives rise to the instant case. The complaint alleges that FMC misrepresented the composition and characteristics of the copper residue and failed to disclose the presence and concentrations of organic chemicals in the material on a number of occasions, both before and after the material arrived in England. Complaint ¶¶ 1, 11–12, 19, 21–27, 29–31, 42–44, 50–52, 69–75.

The Complaint also alleges that the material may present imminent and substantial danger to human health and to the environment. In addition to the RCRA and Alien Torts Act claims that defendant here seeks to dismiss, the complaint alleges common law fraud, strict liability, breach of express and implied warranty and negligence. Complaint ¶¶ 68–109.

### Discussion

A. Defendant's 12(b)(1) Motion

■ Defendant asserts that this Court lacks subject matter jurisdiction over plaintiff's RCRA and Alien Tort Statute claims because the facts recounted in plaintiff's complaint cannot support these claims. With respect to the RCRA claim, defendant confuses the jurisdictional issue it has raised with the merits of the claim. The complaint bases its second claim for relief on RCRA. Notwithstanding the fact that plaintiffs' efforts to apply RCRA extraterritorially present a question of first impression, the complaint states a claim arising under a law of the United States, of which this Court has jurisdiction.[1] As Justice Holmes noted long ago: "When the plaintiff bases his cause of action upon an Act of Congress jurisdiction cannot be defeated by a plea denying the merits of his claim." *The Fair v. Kohler Die and Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716 (1913). *See also Bell v. Hood*, 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946) ("Jurisdiction, therefore, is not defeated as respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover."); *Fogel v. Chestnutt*, 668 F.2d 100 (2d Cir.1981), *cert. denied*, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982); Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3562 at 40–41 ("Since a claim that a right exists under federal law is enough for jurisdiction unless the claim is insubstantial or frivolous, a substantial claim that a remedy may be implied from a

---

**1.** Because this Court grants jurisdiction as to the RCRA claim in the present action, plaintiffs' argument that defendant is estopped from denying jurisdiction as to the RCRA claim by its conduct in the previous proceeding before the Queen's Bench Commercial Court is moot.

federal statute is enough for jurisdiction. If it is held that federal law does not provide for the remedy, the dismissal should be on the merits rather than for want of jurisdiction."). Defendant's 12(b)(1) motion is thus denied with respect to the RCRA claim.

■ When considering Alien Tort Statute claims on a 12(b)(1) motion, courts typically engage "in a more searching preliminary review of the merits than is required, for example under the more flexible "arising under formulation." *Filartiga v. Pena–Irala*, 630 F.2d 876 (2d Cir.1980). This Court will do likewise.

■ An allegation of conduct constituting a treaty violation or a violation of the law of nations is a threshold jurisdictional requirement under the Alien Tort Statute, 28 U.S.C. § 1350. *See Filartiga*, 630 F.2d at 880. If this requirement is not met, an action under section 1350 cannot be maintained. *See id.* at 887. Here, the complaint does not allege any treaty violation that is actionable under the Alien Tort Statute. Therefore, the complaint must allege facts that, if true, would constitute a violation of the law of nations.

Plaintiffs assert that the complaint does allege facts that constitute a violation of the law of nations. In particular, plaintiffs argue that FMC's conduct is violative of the Stockholm Principles, United Nations Conference on the Human Environment (adopted June 16, 1972), to which the U.S. is a signatory.[2] Plaintiffs also cite the Restatement (Third) of Foreign Relations Law § 602(2) (1987), in support of their position.[3]

But these invocations of international law do not establish a violation of such law

under the Alien Tort Statute. In *Filartiga*, one of the few cases to find the Statute applicable, the court stressed that "It is only where the nations of the world have demonstrated that the wrong is of mutual and not merely several, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation within the meaning of the statute." *Filartiga*, 630 F.2d at 888. Subsequent decisions have emphasized the narrow scope of *Filartiga's* holding. For example, in *Zapata v. Quinn*, 707 F.2d 691, 692 (2d Cir.1983) (per curiam) the Second Circuit, citing *Filartiga*, held that the Alien Tort Statute "applies only to shockingly egregious violations of universally recognized principles of international law."

Plaintiffs' reliance on the Stockholm Principles is misplaced, since those Principles do not set forth any specific proscriptions, but rather refer only in a general sense to the responsibility of nations to insure that activities within their jurisdiction do not cause damage to the environment beyond their borders. Nor does the Restatement of Foreign Relations law constitute a statement of universally recognized principles of international law. At most, as plaintiffs' own brief suggests, the Restatement iterates the existing *U.S.* view of the law of nations regarding global environmental protection.

Because the complaint contains no clear allegation of a violation of the law of nations, plaintiffs' second cause of action is dismissed.

**B. Defendant's 12(b)(6) Motion**

■ A motion to dismiss for failure to state a claim tests only the sufficiency of a

---

**2.** Principle 21, which plaintiffs aver is most explicit on the subject, states:

States have, in accordance with the Charter of the United Nations and the principles of international law, the sovereign right to exploit their own resources pursuant to their own environmental policies, and the responsibility to ensure that activities within their jurisdiction or control do not cause damage to the environment of other States or of areas beyond the limits of national jurisdiction.

**3.** The Restatement (Third) of Foreign Relations Law § 602(2) (1987), in discussing the standards regarding "Remedies for Violation of Environmental Obligations," holds that:

[w]here pollution originating in a state has caused significant injury to persons outside that state, or has created a significant risk of such injury, the state of origin is obligated to accord to the person injured or exposed to such risk access to the same judicial or administrative remedies as are available in similar circumstances to persons within the state.

complaint, *see Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), and should not be granted "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Anderson v. Coughlin,* 700 F.2d 37, 40 (2d Cir.1983). A court must accept as true the allegations of the complaint and draw all reasonable inferences in favor of the plaintiff. *See Scheuer,* 416 U.S. at 236, 94 S.Ct. at 1686.

### The RCRA Claim

■ In their complaint, plaintiffs assert as their Second Claim for Relief a cause of action under RCRA's citizen suit provision, 42 U.S.C. § 6972. Specifically, they seek injunctive relief and damages under Section 6972(a)(1)(B), which provides that any person may commence a civil action

> against any person … including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or to the environment.

Plaintiffs contend that they are entitled to relief under this provision because potentially toxic chemicals may evaporate from or leak out of containers in which they have stored the copper residue, posing an imminent and substantial danger to workers nearby and the community at large if the chemicals pollute the local water supply. Complaint ¶¶ 65–66.

Defendant avers, however, that even accepting plaintiffs' allegations as true, as this Court must do on this motion, plaintiffs' claim under section 6972(a)(1)(B) fails to state a claim upon which relief can be granted because RCRA does not extend to waste located within the territory of another sovereign nation. In support of its contention, defendant points to the well-estab-

lished principle of American law "that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *EEOC v. Arabian American Oil Co.,* —— U.S. ——, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) (quoting *Foley Bros. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949)). Defendant notes further that in applying this canon of construction, courts must determine whether "language in the [relevant act] gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or some measure of legislative control." *Id.* (quoting *Foley Bros.,* 336 U.S. at 285, 69 S.Ct. at 577). Thus, defendant maintains that courts must assume that Congress legislates against the backdrop of an underlying presumption against extraterritoriality and therefore must presume that the statute applies only within the United States unless it contains "the affirmative intention of Congress clearly expressed" that it applies abroad. *Id.* (quoting *Benz v. Compania Naviera Hidalgo, S.A.,* 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957)). *See* Def. Mem. at 19–20.

Plaintiffs attempt to work around this principle by pointing to a number of cases, most of which arise under the federal security laws, that purport to grant jurisdiction based on the locus of conduct underlying the claim. In particular, plaintiffs note that in *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir.1972), the Second Circuit appears to have distinguished several cases relied on by defendant in observing that: "when, as here, there has been significant conduct within the territory, a statute cannot properly be held inapplicable simply on the ground that, absent the clearest language, Congress will not be assumed to have meant to go beyond the limits recognized by foreign relations law." *Id.* at 1334. Plaintiffs assert further that the conduct test articulated in *Leasco* remains vital, having just recently been expanded to encompass cases arising under the Racketeer Influenced and Corrupt Organization Act

("RICO"), 18 U.S.C. §§ 1961–1968. *See Al-fadda v. Fenn*, 935 F.2d 475 (2d Cir.1991).

While acknowledging that the endangerment alleged in the present action has occurred primarily in England, plaintiffs maintain that the conduct test should apply here because significant activities giving rise to the endangerment, including the generation of the waste, the making of the contract and the consignment of the waste to the carrier, took place in the U.S. In addition, plaintiffs aver that this case is distinguishable from *Arabian American Oil* and other cases cited by defendant because this case does not involve the application of "substantive" American law.[4]

Defendant responds by arguing that plaintiffs gain little by their reliance on *Leasco* and related cases.[5] Specifically, defendant maintains that nothing in the securities law cases relied on by plaintiffs suggests that the conduct test allows a court

to apply a statute extraterritorially without determining that Congress in fact intended such extraterritorial application. The Court agrees. In *Leasco*, quoted extensively by plaintiffs, the Second Circuit did not apply the conduct test until it combed the legislative history and determined that "Congress meant § 10(b) to protect against fraud in the sale or purchase of securities whether or not these were traded on organized United States markets" and that there was no reason why Congress "should have wished to limit the protection to securities of American issuers."[6] *Leasco*, 468 F.2d at 1336.

In the present case it is difficult to find the type of evidence found in *Leasco* to support extraterritorial application. Plaintiffs, however, argue vigorously that such evidence does exist here both in RCRA's legislative history and in the structure and

---

**4.** Plaintiffs argue that *Arabian American Oil* is inapposite here because it involved the application of substantive U.S. civil rights law abroad. Specifically, because *Arabian American Oil* involved the potential application of Title VII of the Civil Rights Act of 1964 to the employment practices of U.S. employers with respect to U.S. citizen employees working abroad, plaintiffs acknowledge that the extraterritorial application of U.S. law in that case would have threatened fundamental concepts of international comity, such as the interest of a foreign nation in having a uniform legal system for employers and employees within its jurisdiction.

In the instant case, plaintiffs aver that no such aspect of international comity is implicated since British authorities are telling plaintiffs how to manage the waste so that further injury does not occur and if FMC were forced to remove the waste such removal would have to be in compliance with the local regulatory regime for disposal. Thus plaintiffs maintain that British substantive law would control.

**5.** Defendant also maintains that the conduct test is inapplicable to the instant case. Defendant avers that the conduct test is not applicable here because RCRA's imminent and substantial endangerment provision is not triggered by conduct that is proscribed by the statute. The imminent and substantial endangerment provision may apply irrespective of whether there has been a violation of RCRA. Defendant maintains that so long as a solid or hazardous waste is causing or may cause an imminent and substantial endangerment, any person who has contributed or is contributing to the handling, storage, treatment, transportation or disposal of that waste may be required to abate the endan-

germent, regardless of negligence or violation of RCRA. *See* 42 U.S.C. § 6972(a)(1)(B). Stated simply, defendant's point here is that the imminent and substantial endangerment provision is not triggered by conduct but by the existence of a condition of endangerment that exists entirely oversees and thus FMC's conduct cannot give rise to a cause of action under RCRA.

Because the Court today rules that plaintiffs have not even met the lower threshold of congressional intent required under *Leasco* prior to extraterritorial application of a statute, the Court does not reach the question of whether the conduct test or more general principles of statutory construction articulated in *Arabian American Oil* should control.

**6.** These statements notwithstanding, plaintiffs apparently believe that under the conduct test courts may apply U.S. law extraterritorially without any evidence of congressional intent to do so. Under *Leasco* it may be true that when significant conduct occurs in the U.S. "a statute cannot properly be held inapplicable simply on the ground that, absent the clearest language, Congress will not be assumed to have meant to go beyond the limits recognized by foreign relations law." But the *Leasco* court also noted that "it would be equally erroneous to assume that the legislature always means to go to the full extent permitted. This is a question of the interpretation of the particular statute...." *See Leasco*, 468 F.2d at 1334. Thus, while the threshold might be somewhat lower under the conduct test, plaintiffs cannot escape scrutiny into congressional intent by their reliance on *Leasco* and its progeny.

language of RCRA. The Court next considers these arguments.

### a. Legislative History

While conceding that the initial focus of Congress when passing RCRA was entirely domestic, plaintiffs argue that the legislative history to the Hazardous and Solid Waste Amendments of 1984 ("HSWA"), Pub.L. No. 98–616, 98 Stat. 3221 (codified at scattered sections of 42 U.S.C. (Supp. III 1985)), shows the intention of Congress to allow RCRA to apply extraterritorially. Yet the two major pieces of evidence relied on by plaintiffs add little to their case. Plaintiffs cite Representative Mikulski's remarks to the effect that "our own country will have safeguards from the ill effects of hazardous waste upon passage of [HSWA]. We should take an equally firm stand on the transportation of hazardous waste bound for export to other countries." *See* 129 Cong.Rec. 27691 (1984). But these remarks were made in reference to HSWA section 3017, 42 U.S.C. § 6938, RCRA's hazardous waste export provision, which requires notification of a shipment of hazardous waste abroad to the EPA administrator and to the government of the receiving country. Representative Mikulski's remarks, seen in context, almost certainly refer to the export provision and do not apply to RCRA's citizen suit provision, notwithstanding plaintiffs' efforts to link this provision with the waste export provision.[7]

The distinct nature of these provisions is well illustrated by plaintiffs' second piece of evidence. Plaintiffs cite to Senator Mitchell's remarks that "If I were the U.S. Secretary of State, I would want to be sure that no American ally or trading partner is saddled with U.S. wastes it does not want or does not have the capacity to handle in an environmentally sound manner." 130 Cong. Rec. 20816 (1984). Although these remarks were again made in reference to RCRA's waste export provision, plaintiffs attempt to link them to RCRA's remedial provision. But only a few paragraphs earlier in his statements directed explicitly to RCRA's citizen suit provision, Senator Mitchell reveals the domestic focus of his argument over that provision: "Only EPA can sue to abate an imminent hazard.... In light of the thousands of known hazardous waste sites across *this country*, this simply does not make sense.... Citizen suits to abate imminent hazards can expand *the national effort* to minimize these very real threats to *our* well being." *Id.* at 20815 (emphasis added).

Lacking even the evidence cited above as effective support for their position, plaintiffs have produced virtually no evidence in the legislative history to support their view and thus cannot meet even the lower standard of evidence required under *Leasco*.[8]

### b. Structure and Language of RCRA

Plaintiffs concede that nothing in RCRA suggests that Congress intended for its

**7.** As is further addressed *infra,* this Court does not find any evidence to support the proposition that the export provision and the citizen suit provision were meant to be linked in the manner that plaintiffs suggest.

**8.** In addition, it should be noted that defendant has cited considerable legislative history supporting the view that Congress intended an entirely domestic focus for RCRA's citizen suit provision. *See, e.g.,* H.R.Rep. No. 1491, 94th Cong., 2d Sess. 69, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6238, 6307; H.R.Rep. No. 198, 98th Cong., 2d Sess. 53, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5576, 5612; H.R.Conf.Rep. No. 1133, 98th Cong., 2d Sess. 117–119, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5576, 5688–5690.

Also probative of congressional intent with respect to RCRA's citizen suit provision is a

proposed amendment to RCRA called the "Waste Export Control Act" ("WECA"), S. 2598, 100th Cong., 2d Sess., 134 Cong.Rec. S8809–10 (daily ed. June 29, 1988) made by Senator Kasten. The avowed purpose of this bill (which was not enacted) was to amend RCRA to require that waste exported from the United States to other nations be disposed under export permits which would have provided for compliance with standards at least as strict as those under RCRA. One of the proposed findings of the bill was that "existing Federal laws do not provide for any review by the United States of the effects of its exported wastes on the environment of the countries to which the waste is sent." S. 2598, 100th Cong., 2d Sess. § 2(a)(4) (1988). While plaintiffs find this language irrelevant to this case, the Court finds it probative of the fact members of Congress considered that RCRA in its present form does not reach waste located in another country.

regulatory provisions to apply extraterritorially and that RCRA's "substantive" provisions "clearly do not apply abroad." *See* Pltfs. Mem. at 24 nn. 12–13. Yet plaintiffs nonetheless contend that the citizen suit provision of RCRA should be applied extraterritorially. In particular, plaintiffs maintain that two aspects of RCRA, its export provision, 42 U.S.C. § 6938, and the use of the term "any person" in its citizen suit provision, 42 U.S.C. § 6972 support their view.

Yet plaintiffs adduce little evidence to bolster their position. Plaintiffs allege repeatedly that the citizen suit provision and the export provision were passed as part of a single bill, the Hazardous and Solid Waste Amendment of 1984. Even if they were passed at the same time as plaintiffs allege, the two provisions, as noted above, were certainly discussed separately, with a domestic emphasis attached to the remedial provision. Moreover, as defendant notes, the export provision and citizen suit provision were in fact just two of over 60 RCRA amendments passed simultaneously, addressing numerous topics as varied as land disposal practices, ground water monitoring and regulation of underground storage tanks. *See* Hazardous and Solid Waste Amendments of 1984, Pub.L. No. 98–616, 1984 U.S.Code Cong. & Admin.News (98 Stat.) 3221.

As for plaintiffs' second argument, the use of the term "any person" in RCRA's citizen suit provision without more cannot be said to establish RCRA's extraterritorial applicability. This is especially so when, as defendant notes, other portions of the citizen suit provision itself reflect a domestic focus. Thus, for example, the citizen suit venue provision contained in section 6972(a)(1) provides that a citizen suit "shall be brought in the district court for the district in which the alleged endangerment may occur." RCRA contains nothing prescribing a venue for citizen suits concerning waste located in a foreign country.[9] Similarly, section 6972(b)(2) provides that no citizen suit may be commenced until 90 days after the plaintiff has given notice of the endangerment to "the State in which the alleged endangerment may occur" and that a citizen suit cannot be commenced if the "State"[10] has undertaken action to address the alleged endangerment. As with the venue provision, had Congress intended the citizen suit provision of RCRA to apply extraterritorially, it would have spoken to the question of what pre-suit notice would be required for waste located in the territory of another nation and would have addressed the effect on a citizen suit of a suit pending in that nation.

Also damaging to plaintiffs' position is defendant's citation of several other provisions of RCRA that tend to show that in adopting the statute, Congress was concerned with hazardous waste problems in the United States, not in foreign countries. For example, defendant notes that the first section of RCRA, setting forth the findings of Congress with respect to the issues that RCRA was passed to address, characterizes the problem of waste disposal as "a matter national in scope and concern." 42 U.S.C. § 6901(a)(4). Among the congressional findings is that "alternatives to existing methods of land disposal must be

---

**9.** Plaintiffs' efforts to dismiss this argument are unpersuasive. Plaintiffs cite several patent cases for the proposition that a claim does not fail solely because a particular venue provision is inapplicable. However, the cases plaintiffs cite address the question of whether a venue provision should be applied so as to "oust the federal courts of a jurisdiction clearly conferred on them by Congress." *Brunette Machine Works, Ltd. v. Kockum Industries, Inc.,* 406 U.S. 706, 710, 92 S.Ct. 1936, 1939, 32 L.Ed.2d 428 (1972). Here the inquiry is a more basic one: whether Congress clearly intended to create a cause of action with respect to waste located overseas. On this issue, the Supreme Court has indicated that the inapplicability of a statutory venue provision is probative of a lack of congressional intent to apply a statute abroad. *See Arabian American Oil,* 111 S.Ct. at 1234.

**10.** "State" is defined in section 6903(1) specifically to include only "any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands."

developed since many of the cities in the United States will be running out of suitable solid disposal sites within five years unless immediate action is taken." 42 U.S.C. § 6901(b)(8).

In addition, defendant notes that RCRA contains a number of provisions designed to limit the statute's encroachment on state sovereignty, but contains no parallel provisions protecting the sovereignty of other nations. For example, before commencing an action to redress "an imminent and substantial endangerment to health or environment," the administrator of the EPA must provide notice to "the affected State." 42 U.S.C. § 6973(a); there is no analogous provision requiring notice to the appropriate authorities in a foreign country.

Having examined the relevant legislative history and the structure and language of RCRA, this Court is unpersuaded by plaintiffs' claims.[11] Since there is little if any evidence to support plaintiffs' contention that Congress desired RCRA to apply extraterritorially,[12] this Court must decline to apply the statute in the instant case.[13]

*Conclusion*

For the above stated reasons, plaintiffs' First Claim for Relief (Alien Tort Statute) and Second Claim for Relief (RCRA citizen suit provision) are dismissed pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). This does not affect plaintiffs' remaining claims.

SO ORDERED.

---

**11.** It should be noted that both plaintiffs and defendant have articulated a number of policy arguments to support their respective positions. While plaintiff does argue convincingly that applying RCRA extraterritorially in the instant case would not foster international conflict but would likely promote international harmony and help alleviate foreign fears about United State waste exports, defendant has also argued persuasively against the application of RCRA on policy grounds. Stated simply, defendant posits a number of scenarios wherein extraterritorial application of RCRA could create awkward foreign relations difficulties. Thus, for example, under plaintiffs approach any time a foreign government consented to the import of a hazardous waste, foreign citizens who objected to their government's decision could sue in this country to have the waste removed.

**12.** This court also notes that while no commentators have given extensive examination to the

question of whether RCRA applies extraterritorially, those who have considered the question concur that RCRA's provisions in general and the citizen suit provision in particular, do not apply to waste located abroad. *See* Handley, *Hazardous Waste Exports: A Leak in the System of International Legal Controls,* 19 Envtl.L.Rep. (Envtl.L.Inst.) 10,171 (1989); Johnson, *The Basel Convention: The Shape of Things to Come for United States Waste Exports?,* 21 Envtl.L. 299 (1991); Comment, *United States' Waste Export Control Program: Burying Our Neighbors in Garbage;* 40 Am.U.L.Rev. 885 (1991); Note, *Third World Nations are Down in the Dumps: The Exportation of Hazardous Waste,* 16 Brooklyn J. Int'l L. 311 (1990).

**13.** Because the Court dismisses the RCRA claim on defendant's 12(b)(6) motion, the issue of what damages may be recovered under RCRA's citizen suit provision is mooted.