# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARC ECOLOGY; FILIPINO/AMERICAN
COALITION FOR ENVIRONMENTAL
SOLUTIONS; NORMA DUERO; NOEL
DUERO; MARITESS DUERO; VICTORIA
N. MANIAGO; MARITESS BALINTAG;
ELSA E. GONZAGA; MELODY
O'BRIEN; CONNIE R. DOMDOM;
ROSALINA GERONIMO; ALMA G.
BALAWAN; ROSALINDA I. PERAAN;
ZENAIDA A. RILEY; MARISSA C.
NAVIDAD; DOLORES C. MOSE;
ADRIANO B. LAZARTE; LOITA
SAYAT; FRANCISCA SMITH; EDYA P.
WARNER; JENNIFER LANSANGAN;                  No. 04-15031
ANGELICA WARNER; CRISPIN DIALA;                D.C. No.
CHRISTINA MUNOZ; FERNANDO                   CV-02-05651-JW
FERRER; HILARIA FERRER; EMILIO
FERRER; RIA RICHELLE LIMID;                    OPINION
GILBERT PINEDA; FELIPE ESPINOSA,
JR.; RAMIL ESPINOSA; MARIO
MANIALUNG; BETTY B. VALENCIA;
ANGELINA M. LIWANAG; MARY ANN
V. DIEGO; ERNESTO S. BORJA;
OFELIA M. DIZON; NERMINDA B.
SAGUM,
                    *Plaintiffs-Appellants,*

                        v.

UNITED STATES DEPARTMENT OF THE
AIR FORCE; UNITED STATES
DEPARTMENT OF THE NAVY; UNITED
STATES DEPARTMENT OF DEFENSE;
DONALD RUMSFELD, in his capacity
as United States Secretary of
Defense,
              *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of California
James Ware, District Judge, Presiding

Argued and Submitted
January 11, 2005—San Francisco, California

Filed June 15, 2005

Before: Myron H. Bright,* A. Wallace Tashima, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Callahan

---

*The Honorable Myron H. Bright, Senior United States Circuit Judge
for the Eighth Circuit, sitting by designation.

**COUNSEL**

Scott J. Allen, San Francisco, California, for the plaintiffs-appellants.

Todd S. Kim (argued), Martin F. McDermott, and David C. Shilton (briefs), U.S. Department of Justice, Washington, D.C., for the defendants-appellees.

**OPINION**

CALLAHAN, Circuit Judge:

A decade after the United States vacated its occupation of Clark Air Force Base ("Clark") and Subic Naval Base ("Subic") in the Philippines, the plaintiffs-appellants ("the appellants") seek to invoke specialized statutory procedures under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, to compel the U.S. government to perform a preliminary assessment and cleanup of the alleged contamination thereon. As citizens and residents of the Philippines, the appellants argue that CERCLA applies extraterritorially to afford them relief. The district court dismissed the appellants' complaint for failure to state a claim. We affirm because CERCLA does not provide for the extraterritorial application sought by the appellants.

**I**

**A.   Statutory and Regulatory Background**

In 1980, the 96th Congress enacted CERCLA in response to the "serious environmental and health risks posed by indus-

trial pollution." *United States v. Bestfoods*, 524 U.S. 51, 55
(1998). As its name suggests, " 'CERCLA is a comprehensive
statute that grants the President broad power to command
government agencies and private parties to clean up hazard-
ous waste sites.' " *Id.* (quoting *Key Tronic Corp. v. United
States*, 511 U.S. 809, 814 (1994)); *accord* 42 U.S.C.
§ 9604(a). CERCLA's primary objectives are " 'to ensure the
prompt and effective cleanup of waste disposal sites, and to
assure that parties responsible for hazardous substances [bear]
the cost of remedying the conditions they created.' " *Pinal
Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1300
(9th Cir. 1997) (quoting *Mardan Corp. v. C.G.C. Music, Ltd.*,
804 F.2d 1454, 1455 (9th Cir. 1986)).

The statute also provides for a hazard-ranking system by
directing the President to publish the National Contingency
Plan ("NCP"), which is a set of regulations that identifies the
methods for investigating contamination and the criteria for
determining appropriate cleanup actions. 42 U.S.C. § 9605.
The President must list as part of the NCP "national priorities
among the known releases or threatened releases throughout
the United States."[1] *Id.* § 9605(a)(8)(B). The resulting list is
known as the National Priorities List. *Id.*; 40 C.F.R.
§ 300.425(b).

Section 105(d) of CERCLA, the provision under which the
appellants bring suit, provides in pertinent part that:

> Any person who is, or may be, affected by a release
> . . . may petition the President to conduct a prelimi-
> nary assessment of the hazards to public health and
> the environment which are associated with such
> release . . . . If the President has not previously con-
> ducted a preliminary assessment of such release, the

---

[1]Unless indicated otherwise, our use of the term "release" refers to both
a release and a threatened release of a hazardous substance, pollutant, or
contaminant. 42 U.S.C. § 9604(a).

President shall, within 12 months after the receipt of any such petition, complete such assessment or provide an explanation of why the assessment is not appropriate. If the preliminary assessment indicates that the release . . . may pose a threat to human health or the environment, the President shall promptly evaluate such release . . . in accordance with the hazard ranking system . . . to determine the national priority of such release[.]

42 U.S.C. § 9605(d).

CERCLA supplies citizens with the right to bring a claim in certain circumstances. *Id*. § 9659. A citizen may bring a suit against those "alleged to be in violation of any standard, regulation, condition, requirement, or order" under CERCLA. *Id*. § 9659(a). A citizen may also sue the United States for failing to adhere to nondiscretionary duties under CERCLA. *Id*.

The President generally has delegated the authority for cleanups at federal facilities to the particular federal agencies that administer the facilities. *Id*. § 9615 (authorizing delegation). Response authority vests in the Secretary of Defense ("Secretary") when it comes to releases on or originating from a Department of Defense installation. Exec. Order No. 12,580, § 2(d).

In conjunction with CERCLA's amendments of 1986, and premised on this delegation to the Secretary, Congress established the Defense Environmental Restoration Program ("DERP"). 10 U.S.C. §§ 2700 *et seq*. DERP directs the Secretary to "carry out a program of environmental restoration" at facilities under his jurisdiction, but does not establish what the program should entail. *Id*. § 2701(a)(1)-(2), (b). DERP, however, does make the Secretary responsible for carrying out "response actions with respect to releases of hazardous substances from . . . [e]ach facility or site which was under the

jurisdiction of the Secretary and . . . possessed by the United States at the time of actions leading to contamination of hazardous substances." *Id.* § 2701(c)(1)(B).

## B. Factual and Procedural Background

The United States began its operation of Clark and Subic in the early Twentieth Century when it had control of the Philippines. In 1947, after the Philippines attained independence, the United States and the Philippine government entered into an agreement that allowed the United States to continue operating Clark and Subic ("Bases Agreement"). 61 Stat. 4019, T.I.A.S. No. 1775, 1947 U.S.T. LEXIS 393 (1947). The United States maintained the bases until 1992, when it withdrew its military personnel and turned the bases over to the Philippine government.

The appellants are two non-profit environmental organizations and 36 individual Philippine residents "who live and/or travel . . . and/or have family members that live and/or travel on or near the Clark and/or Subic properties[.]" The defendants-appellees ("the appellees") are the Department of the Air Force, Department of the Navy, Department of Defense, and the Secretary in his official capacity. In June 2000, the appellants petitioned appellees Air Force and Navy to conduct preliminary assessments at Clark and Subic. The appellees declined, stating that "CERCLA does not apply to . . . property [ ] located outside the territorial boundaries of the United States" and that "the Philippine government has relinquished any right to demand environmental restoration of the [ ] property by executing a[n] amendment to the [ ] Bases Agreement."

In December 2002, the appellants commenced this CERCLA citizens' suit, alleging that they have been or are likely to be exposed to contamination at Clark and Subic created during the prior American occupation of those facilities. They sought an order compelling the defendants to conduct prelimi-

nary assessments at Clark and Subic and a declaratory judgment that CERCLA applies to those bases.

The appellees responded by filing a motion to dismiss, contending, *inter alia*, that the complaint failed to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion to dismiss, concluding that the relevant provisions of CERCLA do not apply extraterritorially. The court relied on the statutory presumption that " 'legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' " *ARC Ecology v. United States Dep't of the Air Force*, 294 F. Supp. 2d 1152, 1157 (N.D. Cal. 2003) (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*")). The appellants timely appealed from the final judgment of dismissal. FED. R. APP. P. 4(a).

## II

We review de novo a district court's interpretation and construction of a federal statute. *SEC v. McCarthy*, 322 F.3d 650, 654 (9th Cir. 2003). De novo review also applies to a dismissal for failure to state a claim under Rule 12(b)(6). *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002) (per curiam), *cert. denied*, 538 U.S. 921 (2003).

With respect to a Rule 12(b)(6) dismissal, appellate review is limited to the contents of the complaint. *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996). We take as true all allegations of material fact in the complaint and construe them in the light most favorable to the claimant. *Thompson*, 295 F.3d at 895. Dismissal of the complaint is appropriate only if it appears beyond doubt that the claimant can prove no set of facts in support of the claim which would entitle him to relief. *Id.* We may, however, affirm the district court's dismissal for failure to state a claim on any basis supported in the record. *Ove v. Gwinn*, 264 F.3d 817, 821 (9th

Cir. 2001); *Romano v. Bible*, 169 F.3d 1182, 1185 (9th Cir. 1999).

## A.   CERCLA's Application to Clark and Subic

### 1.   CERCLA's Geographic Scope

To determine whether the disputed provisions of CERCLA apply to Clark and Subic, we look first to the plain language of the statute. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002); *Wilderness Soc'y v. Fish & Wildlife Serv.*, 353 F.3d 1051, 1060 (9th Cir. 2003) (en banc). Section 105(d) is silent as to the locations it covers and who may petition for a preliminary assessment. It generally refers to releases without providing any geographic boundaries, and its identification of who may petition for a preliminary assessment is equally vague: "[a]ny person who is, or may be, affected by a release." 42 U.S.C. § 9605(d).

The appellants contend that the district court erred in its determination that section 105(d) of CERCLA does not apply to the alleged pollution of Clark and Subic. They claim that Congress clearly expressed its intent to have CERCLA apply to former military bases located outside the United States. To support their argument, they point to CERCLA's definition of the "United States," which includes "the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, Amercian Samoa, the [U.S.] Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or *possession* over which the United States has jurisdiction." 42 U.S.C. § 9601(27) (emphasis added). The appellants also argue that Congress's extraterritorial intent appears in the plain language of DERP, which provides that "[t]he Secretary shall carry out (in accordance with the provisions of this chapter . . . and CERCLA . . .) all response actions with respect to releases from . . . [e]ach facility or site which was under the jurisdiction of the Secretary and . . . pos-

sessed by the United States at the time of actions leading to contamination[.]" 10 U.S.C. § 2701(c)(1)(A)-(B).

Based on these provisions, reasonable minds could conclude that, when it was enacted, CERCLA applied to Clark and Subic because they were possessed by the U.S. *Id*. The government states, however, that the most reasonable construction of "possession" would be U.S. property that does not rest within the territory of another sovereign nation. We need not decide this point, however, because, as we explain below, even if CERCLA did apply to these former military installations when enacted, the appellants would still have to show that they could state a claim when they filed their action. This they cannot do.

## 2.  No Evidence of Congress's Intent to Provide Relief to Foreign Claimants Like the Appellants

[1] The appellants cannot state a claim under CERCLA due to the statutory presumption against extraterritoriality. The Supreme Court and this court have adhered to the longstanding principle of American law that legislation is presumed to apply only within the territorial jurisdiction of the United States unless the contrary affirmative intention of Congress is clearly expressed. *Aramco*, 499 U.S. at 248 (quoting *Foley Bros. v. Fliardo*, 336 U.S. 281, 285 (1949)); *Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088, 1095 (9th Cir. 1994). Courts must assume that Congress legislates with knowledge of the presumption that a statute "is primarily concerned with domestic conditions." *Aramco*, 499 U.S. at 248 (quotations omitted); *see also Small v. United States*, 125 S. Ct. 1752, 1755 (2005) ("In determining the scope of [a] statutory phrase we find help in the commonsense notion that Congress generally legislates with domestic concerns in mind." (quotation omitted)). In essence, then, courts must resolve restrictively any doubts concerning the extraterritorial application of a statute. *Smith v. United States*, 507 U.S. 197, 204 (1993).

**[2]** In *Aramco*, the Supreme Court held that Title VII of the Civil Rights Act of 1964 did not provide a claim to anyone living outside the territory of the United States even though the statute contained broad provisions extending its prohibitions to " 'any activity, business, or industry in commerce.' " *Aramco*, 499 U.S. at 249 (quoting 42 U.S.C. § 2000e(h)). Despite administrative interpretations of both the EEOC and the Justice Department allowing individuals employed abroad by U.S. companies to seek relief under Title VII's protections, the Court viewed the statute's language to be an insufficient indication to override the presumption against extraterritoriality. *Id*. at 251-53, 258. The Court ruled that a statute could overcome the presumption only through a "clear statement" in the statute itself indicating congressional intent to provide relief to such foreign claimants.[2] *Id*. at 258.

**[3]** Applying the presumption against extraterritoriality to the case at bar, we can find no evidence that Congress expressly (or implicitly) intended to authorize suits under CERCLA by foreign claimants allegedly affected by contamination occurring on a U.S. military base located in a foreign country.[3] *Accord Small*, 125 S. Ct. at 1756 (finding "no con-

---

[2]In a more recent decision, the Supreme Court relaxed the requirement of a "clear statement" of congressional intent within the statute. *Smith*, 507 U.S. at 204. Writing for the majority, Chief Justice Rehnquist stated that there must only be "clear evidence" of congressional intent to apply the statute extraterritorially. *Id*. This slight modification of the direct statement requirement is significant because it allows the courts greater leeway in determining whether Congress intended to override the presumption against extraterritoriality. *Id*. at 201-03. In discerning Congress's intent, Chief Justice Rehnquist considered sources other than the language of the statute itself, including the structure of the act, legislative history, and other non-textual sources. *Id*. Here, sources other than CERCLA's express language do not provide any evidence that Congress intended for the statute to apply extraterritorially.

[3]The appellants' contention that DERP (10 U.S.C. § 2701(c)(1)(A)-(B)) requires the Secretary to apply CERCLA to foreign claimants affected by contamination occurring on any foreign military base also fails to rebut the

vincing indication to the contrary" where a "statute's language does not suggest any intent to reach beyond domestic" conditions). Even if we were to accept that the language in CERCLA cited by the appellants may be interpreted as bringing such sites within the geographic reach of the statute, this would not overcome the statutory presumption against extraterritoriality, which applies with force and counsels against interpreting CERCLA to provide a cause of action to foreign claimants such as the appellants. *Aramco*, 499 U.S. at 258.

## B. No Statutory Coverage of Clark and Subic When the Appellants Filed Suit

[4] We also conclude that the appellants did not state a claim when they filed their case because, at that time, Clark and Subic had already been under the exclusive control of a foreign sovereign, the Philippines, for ten years. Even if at its inception CERCLA covered Clark and Subic, the relevant inquiry is whether the appellants had a cause of action at the time they commenced this litigation in 2002. It is uncontested that the United States no longer has any control or possession of Clark and Subic. We agree with the appellees' concerns that the United States has no "authority to conduct a preliminary assessment or a cleanup at Clark and Subic, which were closed as military bases and returned to Philippine control in 1992." We also agree with the appellees that without an intergovernmental agreement between the United States and the Philippine government, the United States no longer has

---

presumption against extraterritoriality. The appellants do not cite anything in DERP, other than the previously noted language concerning geographic scope, that in any way suggests that Congress intended to provide preliminary-assessment and cleanup claims to foreign claimants. *See Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 188 (1993) (reasoning that the "presumption [against extraterritoriality] has special force when . . . construing . . . statutory provisions that may involve foreign and military affairs for which the President has unique responsibility").

authority to address any alleged contamination present on or around Clark and Subic.

It would be unreasonable for this court to find that, in enacting CERCLA, Congress intended for the President to undertake preliminary assessments or cleanups on foreign soil absent some agreement with the foreign government. Such a holding would impermissibly encroach on the Executive's foreign affairs authority. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) (observing that the Constitution allocates the foreign relations power to the federal executive); *see also Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948) (noting the President's role as the "[n]ation's organ in foreign affairs"). Certainly, nothing in CERCLA requires such action.[4]

## C.  *Expressio Unius Est Exclusio Alterius*

[5] The appellants' attempt to state a claim under CERCLA is further defeated by the fact that CERCLA expressly authorizes some actions by a narrow class of foreign claimants, which does not include the appellants:

> **Foreign Claimants**. To the extent that the provisions of this chapter permit, a foreign claimant may assert a claim to the same extent that a United States claimant may assert a claim if — (1) the release . . . occurred (A) in the navigable waters or (B) in or on the territorial sea or adjacent shoreline of a foreign country of which the claimant is a resident; (2) the claimant is not otherwise compensated for his loss;

---

[4]The provision in CERCLA concerning foreign claimants, 42 U.S.C. § 9611(*l*), recognizes these limitations as it restricts recovery by foreign claimants to instances where such relief is authorized by treaty, executive agreement, or where the Secretary of State certifies that the foreign claimant's country provides a reciprocal remedy to U.S. citizens. *See* Part II.C, *supra*.

(3) the hazardous substance was released from a facility or from a vessel located adjacent to or within the navigable waters or was discharged in connection with activities conducted under the Outer Continental Shelf Lands Act . . . or the Deepwater Port Act . . . ; and (4) recovery is authorized by a treaty or an executive agreement between the United States and foreign country involved, or if the Secretary of State, in consultation with the Attorney General and other appropriate officials, certifies that such country provides a comparable remedy for United States claimants.

42 U.S.C. § 9611(*l*). The appellants do not meet the requirements of this passage.[5] Indeed, they allege releases of hazardous substances or pollutants occurring on the Clark and Subic facilities and not, as the statute requires, in the navigable waters, territorial sea, or adjacent shoreline of a foreign country. 42 U.S.C. § 9611(*l*)(1). More importantly, the appellants do not allege that their suit is authorized by a "treaty or an executive agreement" between the United States and the Philippines or that the Secretary of State has certified that the government of the Philippines provides a comparable remedy for American claimants. *Id*. § 9611(*l*)(4).

[6] Reinforcing this barrier to asserting a claim is the doctrine of *expressio unius est exclusio alterius*, which teaches that omissions are the equivalent of exclusions when a statute affirmatively designates certain persons, things, or manners of operation. *Boudette v. Barnette*, 923 F.2d 754, 756-57 (9th Cir. 1990); *In re McLinn*, 744 F.2d 677, 683 (9th Cir. 1984).

---

[5]We recognize that the appellants seek equitable relief and that section 9611(*l*) applies only to actions looking to recover money from the Superfund. *See* 42 U.S.C. § 9601(5) (defining "claimant" as "any person who presents a claim for compensation under this chapter"). We discuss section 9611(*l*), however, not because it directly controls the appellants' case, but because it shows that Congress specifically provided for relief for certain claims by foreign claimants, which do not include the appellants.

Applying this doctrine to CERCLA bolsters the conclusion that only foreign claimants satisfying section 9611(*l*)'s express requirements may proceed to court under CERCLA. *Id*.; 42 U.S.C. § 9611(*l*).

This conclusion is further supported by the fact that Congress has provided other avenues for foreign claimants to seek relief, which the appellants have not explored. For example, Congress has established the Foreign Claims Act for compensating any "inhabitant of a foreign country" for property loss, personal injury, or death incident to noncombat activities of U.S. armed forces occurring outside the United States. 10 U.S.C. § 2734(a). This statute illustrates the principle that when Congress seeks to legislate with extraterritorial effect, it does so with unmistakable intent.

## D.   Other Provisions Demonstrate That the Appellants Have No Claim Under CERCLA

**[7]** When considering other provisions of CERCLA, we find that the statute's general approach, concerns, and procedures are inimical to judicial challenges to contamination alleged from sites outside the territorial boundaries of the United States. *See United States v. Bonilla-Montenegro*, 331 F.3d 1047, 1051 (9th Cir. 2003) (avoiding "a statutory construction that would render another part of the same statute superfluous"); *see also Hughes Air Corp. v. Pub. Utilities Comm'n*, 644 F.2d 1334, 1338 (9th Cir. 1981) (adhering to the "basic rule of statutory construction [ ] that one provision should not be interpreted in a way which is internally contradictory or that renders other provisions of the same statute inconsistent or meaningless"). For instance, CERCLA requires the President to "consult with the affected State or States" before determining appropriate remedial action. 42 U.S.C. § 9604(c)(2). No analogous provision requires consultation with foreign authorities. Similarly, the President cannot provide remedial actions "unless the State in which the release occurs first enters into a contract or cooperative agree-

ment" with the United States. *Id*. § 9604(c)(3). The statute does not contemplate like arrangements with foreign countries.

In addition, CERCLA's citizen-suit provision states that a case "shall be brought in the district court for the district in which the alleged violation occurred." *Id*. § 9659(b)(1). The statute, however, does not prescribe venue for citizen suits involving alleged violations in foreign countries.[6] *See Smith*, 507 U.S. at 202-03 (noting that Congress does not intentionally "create venue gaps" that "take away with one hand what Congress has given by way of jurisdictional grant with the other"); *see also Aramco*, 499 U.S. at 256 (reasoning that a statute's venue provisions are "ill-suited for extraterritorial application" when they provide for venue only in the "judicial district in the State where certain matters . . . occurred or were located").

[8] Similarly, there is no provision in CERCLA that provides authority to place any foreign site on the National Priorities List, and, consequently, no foreign site appears on that list.[7] 42 U.S.C. § 9605(a)(8)(B); 40 C.F.R. § 300.425(b). Because the statute authorizes the President to rank the subjects of a preliminary assessment in a system that applies exclusively to releases in the United States, the necessary conclusion is that Congress did not intend for CERCLA to

---

[6]On a related note, no citizen suit may be commenced under CERCLA until 60 days after the plaintiff has given notice of the alleged violation to, among others, "[t]he *State* in which the alleged violation occurs." 42 U.S.C. § 9659(d)(1) (emphasis added). Had Congress intended CERCLA's citizen-suit provision to extend to foreign lands, it would have provided a pre-filing notice for cases that allege releases occurring abroad.

[7]Placement of a site on the list makes the site eligible for remedial action through the expenditure of money from the Superfund, a fund established by CERLCA and financed through a combination of appropriations, EPA fees, and industry taxes. 42 U.S.C. § 9605; *United States v. Hercules, Inc.*, 247 F.3d 706, 715 (8th Cir. 2001).

encompass the appellants' claims. 42 U.S.C. § 9605(a)(8)(A), (d).

## E.    Legislative History and Academic Commentary

**[9]** We have not been cited to any aspect of CERCLA's legislative history that supports the recognition of a claim for alleged contamination of a site outside of the United States. The legislative history recited by the district court indicates that Congress intended for CERCLA to have a domestic focus. For example, a House committee report noted, just prior to CERCLA's re-authorization, that "there may be as many as 10,000 [ ] sites across the Nation," and that the federal government's allocation of resources was inadequate to "fulfill promises that were made to clean up abandoned hazardous wastes in *this* country." H.R. Rep. No. 99-253, pt. 1, at 55, *reprinted in* 1986 U.S.C.C.A.N. 2835, 2837 (emphasis added). Because the congressional record is silent as to any extraterritorial application of CERCLA, it is unlikely that Congress intended for CERCLA to provide relief to the appellants. *See Small*, 125 S. Ct. at 1757 ("[T]hose who use legislative history to help discern congressional intent will see the history here as silent, hence a neutral factor, that simply confirms the obvious, namely, that Congress did not consider the issue."); *see also Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 266-67 (1979) ("This silence is most eloquent, for such reticence while contemplating an important and controversial change in existing law is unlikely.").

**[10]** We also note that the available academic commentary on the scope of CERCLA's application unanimously agrees that Congress did not intend for CERCLA to apply in the manner sought by the appellants. For example, one commentator observes, "citizen suits by aliens rest on a slim foundation. Even if allowed, such lawsuits would be limited to conduct occurring within the U.S. . . ." Lisa T. Belenky, *Cradle to Border: U.S. Hazardous Waste Export Regulations and International Law*, 17 Berkeley J. Int'l L. 95, 135 (1999);

*accord* Peggy Rodgers Kalas, *International Environmental Dispute Resolution and the Need for Access by Non-state Entities*, 12 COLO. J. INT'L ENVTL. L. & POL'Y 191, 194 (2001); Jack I. Garvey, *a New Evolution for Fast-tracking Trade Agreements: Managing Environmental and Labor Standards Through Extraterritorial Regulation*, 5 UCLA J. INT'L L. & FOR. AFF. 1, 39-40 (2000); Richard A. Wegman & Harold G. Bailey, *The Challenge of Cleaning Up Military Wastes When U.S. Bases are Closed*, 21 ECOLOGY L.Q. 865, 924-25 (1994).

## III

Perhaps recognizing the tenuous nature of their claims under domestic law, the appellants suggest that we should interpret CERCLA to apply extraterritorially so as not to run afoul of international law. The appellants rely on international principles espousing the view that activities within a country's jurisdiction or control should not cause significant injury to the environment of another country. The Restatement of Foreign Relations Law of the United States appears to support this view.[8] RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES §§ 601-602 (1987).

---

[8]The appellants concede that it is uncertain whether the sources of international law on which they rely provide accurate statements of international law. However respectable the Restatement may be, it "is not a primary source of authority upon which, standing alone, courts may rely for propositions of customary international law." *United States v. Yousef*, 327 F.3d 56, 99 (2d Cir. 2003) (emphasis omitted); *see also C.L. Maddox, Inc. v. Coalfield Servs., Inc.*, 51 F.3d 76, 81 (7th Cir. 1995) ("The Restatement of course is not law."). A court that has had occasion to consider these sources determined that they are unreliable. *Amlon Metals, Inc. v. FMC Corp.*, 775 F. Supp. 668, 671 (S.D.N.Y. 1991). Indeed, the Restatement's own authors admit that " 'in a number of particulars the formulations in this Restatement are at variance with positions that have been taken by the United States Government.' " *Yousef*, 327 F.3d at 100 (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES at ix (1987)).

Even if we were to accept the appellants' gloss on international law — that one nation should not injure another nation's environment — it does not follow that denying the appellants a cause of action as of 2002 violates international law. The appellants offer no authority for the proposition that international law recognizes a current claim for a preliminary assessment or cleanup of Philippine territory based on actions taken over a decade ago. Furthermore, assuming that the United States "injured" the Philippines during its operation of Clark and Subic, compensation presumably was or should have been negotiated between the two nations when the United States turned the bases over to the Philippines. Thus, we do not find that the appellants have presented an actual conflict between domestic and international law.

Finally, the appellants' reliance on the *Charming Betsy* canon of statutory construction is misplaced. In *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804), the Supreme Court had to determine whether a ship could be seized for violating an American embargo against France. *Id*. at 115-18. The Court interpreted the relevant statute so as to avoid embroiling the nation in a foreign policy dispute unforeseen by either the President or Congress, holding that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Id*. at 118.

*Charming Betsy* is of no comfort to the appellants for at least two reasons. First, as this court has observed, "the Supreme Court has never invoked *Charming Betsy* against the United States in a suit in which it was a party." *United States v. Corey*, 232 F.3d 1166, 1179 (9th Cir. 2000). The concerns that underlie the canon are "obviously much less serious where the interpretation arguably violating international law is urged upon [the court] by the Executive Branch of our government." *Id*. When the Executive Branch is the party advancing a construction of a statute with potential foreign policy implications, we presume that "the President has evaluated

the foreign policy consequences of such an exercise of U.S. law and determined that it serves the interests of the United States." *Id*.

For this same reason, the canon plays no role in interpreting the disputed provisions of CERCLA. *Id*. Moreover, accepting the appellants' broad interpretation of the statute would be the equivalent of forcing the United States to encroach on the territory and affairs of another sovereign. Such an interpretation would make the judiciary the impetus for " 'unintended clashes between our laws and those of other nations which could result in international discord.' " *Id*. at 1169 (quoting *Aramco*, 499 U.S. at 248). These are the exact ends that the *Charming Betsy* canon seeks to bypass.

Second, the appellants offer no example of where a court has invoked the *Charming Betsy* canon to extend the effect of domestic legislation into another sovereign's territory. Of course, courts have held just the opposite. "[T]he practice of using international law to limit the extraterritorial reach of statutes is firmly established in our jurisprudence." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 818 (Scalia, J., dissenting) (citing federal case law tempering the extraterritorial application of federal statutes).

*Charming Betsy* itself concerned a private dispute, one which the Court resolved by interpreting the relevant statute so as to avoid embroiling our nation in a foreign policy dispute unforeseen by either the President or Congress. *See Charming Betsy*, 6 U.S. at 118. Rather than producing harmony with international laws, the appellants' interpretation that CERCLA applies to other countries may result in precisely what *Charming Betsy* seeks to avoid — intrusion on the affairs of foreign sovereigns and international discord. *See United States v. Thomas*, 893 F.2d 1066, 1069 (9th Cir. 1990) (adhering to the *Charming Betsy* canon "out of respect for other nations") (citing *Chua Han Mow v. United States*, 730 F.2d 1308, 1311 (9th Cir. 1984)). As the Department of

Defense recognizes through its own regulations, "[t]reaty obligations and the sovereignty of other nations must be respected, and restraint must be exercised in applying United States laws within foreign nations unless Congress has expressly provided otherwise." 32 C.F.R. § 187.4(c). Consistent with this perspective, we express no opinion as to what steps, if any, the appellants might take in consulting with their own government to achieve environmental remediation in the region.

## IV

**[11]** For the foregoing reasons, the district court correctly determined that the appellants failed to state a proper claim under CERCLA. The statutory presumption against extraterritoriality, far from being overcome here, is consistent with the legislative purpose underlying CERCLA. The appellants cannot state a claim because there is no evidence that Congress intended for CERCLA to provide relief to foreign claimants such as the appellants and CERCLA did not apply to Clark and Subic when the appellants filed their action in 2002. Our determination that the appellants cannot state a cognizable claim is also consistent with other provisions of CERCLA, its legislative history, and the available academic commentary on the statute's extraterritorial application. Finally, the appellants' invocation of *Charming Betsy* is inapposite as we perceive no real conflict between international law and our determination. Accordingly, the decision of the district court is **AFFIRMED**.